**Irena K. PETRI and John Todd, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**T. Wayne GATLIN, Jesse D. Smith, Jerry Pajares, and Santanna Natural Gas Corporation, a Texas corporation, Defendants.**

No. 97 C 2393.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 30, 1997.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Rick D. Young, Edelman & Combs, Chicago, IL, for Plaintiffs.

Charles William Siragusa, Wade R. Joyner, Jeffrey Scott Burns, Paul F. Markoff, Crowley, Barrett & Karaba, Ltd., Chicago, IL, for Defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

Before the court are Santanna Natural Gas Corporation's and the individual defendants' motions to dismiss the complaint. For the reasons stated in this opinion, the motions to dismiss are granted in part and denied in part.

### BACKGROUND

Viewed in the plaintiffs' favor, the relevant facts are as follows. Under a policy known as the Transportation Gas Program, local gas distribution companies ("LDCs") such as Peoples' Gas Light & Coke Company, Illinois Power, and Northern Illinois Gas permit "commercial rate" customers—multi-unit apartment buildings, hospitals, factories, schools, government entities and the like—to purchase gas at discount prices from independent third party suppliers. These customers purchase the gas from the independent suppliers instead of obtaining it directly from the LDC. Amended Complaint ¶¶ 12, 14, 16. Independent suppliers deliver the purchased gas to the LDCs, and the LDCs in turn deliver the gas to the customers' commercial sites via LDC pipelines. The LDC charges customers for the use of the pipelines, while the independent suppliers charge for the amount of gas actually used by the customers. Id.

Santanna Natural Gas Corporation ("Santanna"), an independent third party supplier, participates in the Program and thus sells natural gas to "commercial end users" throughout the state of Illinois. Id. ¶ 11. On Santanna's corporate roster (and hereafter referred to as "the individual defendants") are T. Wayne Gatlin, the president, chief executive officer, chairman of the board of directors, and controlling shareholder; Jesse D. Smith, the executive vice president; and Jerry Pajares, the secretary and treasurer. The plaintiffs, Irena K. Petri and John R. Todd, each own one or more multi-unit apartment buildings. Id. ¶ 5. On or about July 20, 1993, Todd agreed to purchase natural gas from Santanna. Pursuant to the agreement, the parties entered into a "Gas Sales Contract" and an "Agency Agreement." Id. ¶¶ 31–32. The parties agreed in the Contract and the Agreement to be bound by Texas law. Id. ¶ 32 (referring to § 16.4 of the Contract and § 6.4 of the Agreement). On or about November 11, 1995, Petri reached a similar agreement with Santanna, and likewise entered into a "Gas Sales Contract" and an "Agency Agreement." Id. ¶ 38. The parties agreed in the Contract and the Agreement to be bound by Illinois law. Id. ¶ 38 (referring to § 10.4 of the Contract and § 4.4 of the Agreement). Todd terminated his relationship with Santanna in January 1997, while Petri terminated her relationship with Santanna in December 1996. Id. ¶¶ 37, 39.

The problem, according to the plaintiffs, is that Santanna induced them (and thousands

of other consumers) into signing sales contracts by making a series of misrepresentations. Santanna promotional brochures state that by purchasing natural gas from Santanna instead of an LDC, a customer "can save 15–35%. on [his] annual heating or processing bill with *no investments* and *no risk!*" *Id.* ¶ 20 (quoting the brochure). The plaintiffs claim that the most a customer can realistically expect to save is 8 to 15 percent per year, and that this fact was well known to the defendants when they disseminated the brochures. *Id.* ¶¶ 21–22. The brochures also state that Santanna "guarantees that our price per therm will never be greater than the utility company [sic]." *Id.* ¶ 23 (quoting the brochure).[1] The Agency Agreements signed by the plaintiffs contain similar language. *Id.* ¶¶ 33, 41. Again, however, the plaintiffs contend that the truth of the matter is that Santanna's prices often exceed those of the LDC. This disparity was also known to the defendants when they disseminated the brochures and signed the Agreements. *Id.* ¶¶ 24–25, 34–36, 42–44. In addition, the standardized Gas Sales Contracts used by Santanna state that "[t]he price per Therm shall be based on the monthly market price then in effect for natural gas delivered to the various natural gas Sales Point(s) into the interstate pipelines." *Id.* ¶ 40 (quoting § 3.1 of Petri's Gas Sales Contract). The plaintiffs maintain that because gas prices fluctuate on a daily basis, the "monthly market price" as described in the Contracts simply does not exist. *Id.* ¶ 46. Santanna allegedly exploited this contractual ambiguity by charging higher prices without full disclosure. *Id.* ¶¶ 47–48.

In April 1997, the plaintiffs filed a multicount complaint naming Santanna, Gatlin, Smith, and Pajares as defendants. As amended on May 28, 1997, the complaint includes the following six claims. Count I alleges that Santanna breached the plaintiffs'

contracts by charging prices "other than the lowest monthly market price" and greater than those charged by The LDC. *Id.* ¶ 61. Counts II and III allege that Santanna and the individual defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA" or "Act") and the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA" or "Act") by (1) deliberately using ambiguous price terms in standardized contracts and charging prices other than the lowest monthly market rate; (2) guaranteeing that the prices charged would be lower than those charged by the LDC; (3) assuring customers that they could save between 15 and 35 percent per year on their gas bills; (4) acting as agents for customers but failing to disclose that the prices charged were higher than the lowest monthly market price; and (5) acting as agents for customers but failing to disclose that the prices charged were often higher than those charged by the LDC. *Id.* ¶¶ 67, 73. Count IV alleges that Santanna breached a fiduciary duty owed to the plaintiffs by committing the same five acts described in Counts II and III. *Id.* ¶ 79. Counts V and VI allege that Santanna and the individual defendants[2] violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by engaging in a scheme to defraud consumers. Santanna and the individual defendants purportedly engaged in such a scheme by committing the same five acts described in Counts II, III, and IV. *Id.* ¶¶ 85, 97. Counts V and VI also allege that Santanna and the individual defendants repeatedly used "[t]he mails, interstate carriers, and interstate wire transmissions" in furtherance of their scheme to defraud. *Id.* ¶¶ 86, 98.

In June 1997, both Santanna and the individual defendants filed motions to dismiss the complaint.[3] The motions challenge the sufficiency of the complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b). As we

---

1. The heating content of natural gas is measured in British thermal units, or "BTUs." "Therm" is commonly used in the natural gas industry to denote 100,000 BTUs.

2. Count V pertains only to the individual defendants. Count VI pertains both to the individual defendants and to Santanna. Amended Complaint ¶¶ 82, 92.

3. The individual defendants also filed a motion to dismiss the complaint for want of personal jurisdiction. Because this motion has not yet been fully briefed by the parties, we will not address it in today's opinion.

explain in greater detail in the pages that follow, we hold that (1) the plaintiffs' allegations in Count I that the defendants violated the terms of the Agency Agreements are sufficient to state a claim for breach of contract; (2) the plaintiffs' allegations in Counts II and III that the defendants misrepresented material facts in their promotional brochures are sufficient to state a claim under the Illinois Consumer Fraud Act and the Texas Deceptive Trade Practices Act; (3) the plaintiffs' allegations in Count IV that the defendants failed to disclose facts relating to Santanna's and the LDC's prices are sufficient to state a claim for breach of fiduciary duty; (4) the plaintiffs' allegations in Counts V and VI that the defendants violated the Racketeer Influenced and Corrupt Organizations Act by using the mails in furtherance of a purportedly fraudulent scheme are insufficient when viewed through the lens of Federal Rule of Civil Procedure 9(b); and (5) the plaintiffs' allegations in Count VI that the defendants acted illegally by exercising control over the plaintiffs' "enterprises" are independently insufficient to state a claim under RICO.

## DISCUSSION

The defendants' arguments revolve around two provisions of the Federal Rules of Civil Procedure: Rule 9(b) and Rule 12(b)(6). The defendants contend that Count I fails to state a claim under Rule 12(b)(6), and that Counts II, III, IV, V, and VI fail to state claims under both 12(b)(6) and 9(b). For the sake of clarity, we will separately analyze the last five counts of the complaint under the rubric of Rule 12(b)(6), and then under the rubric of Rule 9(b) *See General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir.1997) (performing a similar analysis). We begin by discussing the standard of review under each of the relevant rules.

The standard of review under Rule 12(b)(6) is well known. The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 294 (2d ed.1990). When evaluating such a motion, the court must accept as true all factual allegations in the complaint

and draw all reasonable inferences in the plaintiff's favor. *Jang v. A.M. Miller & Associates,* 122 F.3d 480, 483 (7th Cir.1997); *Travel All Over The World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996). Dismissal is appropriate only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Ledford v. Sullivan,* 105 F.3d 354, 356, (7th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Jones v. General Elec. Co.,* 87 F.3d 209, 211 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996).

The standard of review under Rule 9(b) is more demanding. The rule provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) thus requires a complaint alleging fraud to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 924 (7th Cir.1992) (quoting *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (stating that Rule 9(b) requires a plaintiff to identify "the who, what, when, where, and how: the first paragraph of any newspaper story"); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297, at 608–12 (2d ed. 1990) ("A pleading that simply avers the technical elements of fraud does not have sufficient informational content to satisfy the rule's requirement."). The rule "is said to serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 777 (7th Cir.1994).

## I. Count I (Breach of Contract)

 The ground rules for Count I of the complaint are straightforward. To prevail on a breach of contract claim under Illinois law,

a plaintiff must establish (1) the existence of a valid and enforceable contract, (2) his own performance under the terms of the contract, (3) a breach of the contract by the defendant, and (4) an injury suffered as a result of the defendant's breach. *Chandler v. Southwest Jeep–Eagle, Inc.*, 162 F.R.D. 302, 311 (N.D.Ill.1995); *Aardvark Art, Inc. v. Lehigh/Steck–Warlick, Inc.*, 284 Ill.App.3d 627, 220 Ill.Dec. 259, 672 N.E.2d 1271, 1275 (1996) (quoting *Mannion v. Stallings & Co., Inc.*, 204 Ill.App.3d 179, 149 Ill.Dec. 438, 561 N.E.2d 1134, 1138 (1990)). A plaintiff asserting a claim for breach of contract under Texas law must make a similar showing. *Perez v. Alcoa Fujikura, Ltd.*, 969 F.Supp. 991, 1012 (W.D.Tex.1997); *Elf Exploration, Inc. v. Cameron Offshore Boats, Inc.*, 863 F.Supp. 386, 390 (E.D.Tex.1994); *Hussong v. Schwan's Sales Enterprises, Inc.*, 896 S.W.2d 320, 326 (Tex.App.1995).

Not so straightforward is the degree of specificity with which a plaintiff must plead a breach of contract claim in order to survive a motion to dismiss in a diversity case. Illinois courts adhere to the rule that "[t]o plead properly a cause of action in breach of contract a plaintiff must allege the essential elements of the cause of action." *Nielsen v. United Services Auto. Ass'n*, 244 Ill.App.3d 658, 183 Ill.Dec. 874, 612 N.E.2d 526, 529 (1993); *accord Barille v. Sears Roebuck and Co.*, 289 Ill.App.3d 171, 224 Ill.Dec. 557, 682 N.E.2d 118, 121 (1997); *Nuccio v. Chicago Commodities, Inc.*, 257 Ill.App.3d 437, 195 Ill.Dec. 670, 628 N.E.2d 1134, 1139 (1993); *see generally OnTap Premium Quality Waters, Inc. v. Bank of N. Ill., N.A.*, 262 Ill. App.3d 254, 199 Ill.Dec. 586, 634 N.E.2d 425, 429 (1994) (holding that "[i]n the absence of supporting facts," general allegations regarding contract formation "may not be admitted as true by a motion to dismiss"). That comes as no surprise, since Illinois has long been a "fact pleading" (rather than "notice pleading") state. *See People v. $1,124,905 U.S. Currency and One 1988 Chevrolet Astro Van*, 177 Ill.2d 314, 226 Ill.Dec. 627, 685 N.E.2d 1370, 1380 (1997) (slip copy); *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, 217 Ill.Dec. 720, 667 N.E.2d 1296, 1300 (1996); *see also Richco Plastic Co. v. IMS Co.*, 288 Ill.App.3d 782, 224 Ill.Dec. 74, 681

N.E.2d 56, 58 (1997) ("Unlike some jurisdictions that permit notice pleading, Illinois is a fact pleading jurisdiction. In order to set forth a good and sufficient claim or defense, a pleading must allege ultimate facts sufficient to satisfy each element of the cause of action or affirmative defense pled.") (citation omitted); *Lempa v. Finkel*, 278 Ill.App.3d 417, 215 Ill.Dec. 408, 663 N.E.2d 158, 163 (1996) ("Illinois requires fact pleading, not notice pleading."). Citing the four-part test for a breach of contract claim, some federal courts have also implied that a plaintiff must allege facts supporting each of the four elements. *See Servpro Indus., Inc. v. Schmidt*, 905 F.Supp. 475, 479 (N.D.Ill.1995) (dismissing a breach of contract claim on a 12(b)(6) basis and stating that "a conclusory allegation of a breach is insufficient; [a plaintiff] must state the facts underlying the breach"); *accord Carl v. Galuska*, 785 F.Supp. 1283, 1289 (N.D.Ill.1992). Cognizant of these decisions, Santanna argues that Count I of the complaint should be dismissed because (1) the plaintiffs have alleged neither "the requisite elements of the existence of a contract" nor their own performance of all contractual terms, *see* Defendant Santanna Natural Gas Corporation's Memorandum Of Law In Support of Its Motion To Dismiss ("Santanna Memorandum") at 18; Defendant Santanna Natural Gas Corporation's Reply Memorandum In Further Support Of Its Motion To Dismiss ("Santanna Reply") at 15–17; and (2) the sales agreement between Petri and Santanna "does not contain any requirement that Santanna charge her or anyone else 'the lowest monthly market price for natural gas.' " Santanna Memorandum at 18; Santanna Reply at 17.

■ Even if a complaint is deficient in a "fact pleading" jurisdiction, however, its insufficiency in a "notice pleading" jurisdiction is not a foregone conclusion. As the Seventh Circuit recently observed in *Albiero v. City of Kankakee*, 122 F.3d 417 (7th Cir.1997), while a plaintiff in state court might be required to allege all of the facts essential to recovery under his chosen legal theory, that is not the case in federal court. *Id.* at 419; *see also Redfield v. Continental Cas. Corp.*, 818 F.2d 596, 605 (7th Cir.1987) (highlighting

the differences between fact pleading and notice pleading and stating that "a plaintiff in federal court need· not set out in detail the facts upon which his claim is based"); *Resolution Trust Corp. v. Fortunato,* No. 94 C 2090, 1994 WL 478616, at *3 (N.D.Ill. Sept.1, 1994) (recognizing that a complaint which "would likely fail under the rigorous fact pleading standards of the Illinois state courts" is not automatically deficient under the "more liberal standard" of the Federal Rules); *Ganton Technologies, Inc. v. Quadion Corp.,* 755 F.Supp. 203, 207 (N.D.Ill. 1990) ("In a diversity action, the court is to assess the adequacy of the pleadings under federal law, rather than the stricter requirements of Illinois law."); *see generally American Nurses' Ass'n v. Illinois,* 783 F.2d 716, 727 (7th Cir.1986) ("[A] complaint is not required to allege all, or any, of the facts logically entailed by the claim."); *Abdoh v. City of Chicago,* 930 F.Supp. 311, 313 (N.D.Ill.1996) ("It is well settled that a plaintiff in federal court is not required to allege detailed facts in support of his claim."). Indeed, under the liberal system of notice pleading envisioned by Federal Rule of Civil Procedure 8,[4]

> complaints need not contain elaborate factual recitations. They are supposed to be succinct.... Any need to plead facts that, if true, establish each element of a "cause of action" was abolished by the Rules of Civil Procedure in 1938, which to signify the radical change from code pleading also replaced "cause of action" with "claim for relief." One pleads a "claim for relief" by briefly describing the events. At this stage the plaintiff receives the benefit of

imagination, so long as the hypotheses are consistent with the complaint.

*Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994) (citations omitted), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996). In short, once it arrives in federal court, "[a] suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Graehling v. Village of Lombard, Ill.,* 58 F.3d 295, 297 (7th Cir.1995).

 With these principles in mind, we reject the defendants' first argument and hold that the plaintiffs have· sufficiently alleged breaches of the Agency Agreements. The plaintiffs have at least generally alleged the existence of contractual agreements, *see* Amended Complaint ¶¶ 32, 38 (referring to, among other things, the Agency Agreements); the defendants' breaches of those contracts, *see id.* ¶¶ 35–36, 42–43, 61 (describing the breaches); and damages resulting from the defendants' breaches. *See id.* ¶¶ 35–36, 43–44, 62 (comparing prices charged by the defendants with LDC prices). As the defendants point out, the plaintiffs have not specifically alleged their own compliance with each contractual term.[5] But as the foregoing paragraph makes clear, the Federal Rules do not require a plaintiff to allege specific facts which "establish" each element of a claim for relief. Rather, the complaint need only inform a defendant of the charge against him by concisely narrating the incident or incidents in question. The complaint in this case unquestionably provides adequate notice to the defendants of

---

4. Rule 8 provides in relevant part:
 **(a) Claims for Relief.** A pleading which sets forth a claim for relief ... shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks....
 **(e) Pleading to be Concise and Direct; Consistency.** ... each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required....
 **(f) Construction of Pleadings.** All pleadings shall be so construed as to do substantial justice.

5. For example, § 3.5 of Petri's agency agreement provides that Santanna's price guarantees "be-

come effective at the beginning of the fourth (4th) month of natural gas deliveries" to Petri by Santanna. The defendants argue that Petri has not alleged the date on which Santanna began delivering natural gas to her, and thus has not established the date on which the price guarantees went into effect. Santanna Reply at 16. The defendants also note that § 5.5 of Petri's sales contract states that "[c]orrections will be permitted to any monthly transaction up to one hundred and eighty days (180) after the end of the month in question." The defendants argue that dismissal is likewise in order because Petri has not alleged that she contested any invoices within 180 days. *Id.*

the nature of the plaintiffs' breach of contract claim, and the hypothesis that the plaintiffs fulfilled their contractual obligations is certainly consistent with the allegations in the complaint. A line-by-line review of the relevant contracts, accompanied by "specific facts" demonstrating the plaintiffs' compliance with each and every provision of those contracts, is simply not necessary at this stage of the proceedings.

■ The defendants' second argument—that the plaintiffs' claim that Santanna breached Petri's Gas Sales Contract is contradicted by the language of the agreement [6] —is more persuasive. Focusing on § 3.1 of that contract, which provides that "[t]he price per Therm shall be based on the monthly market price then in effect for natural gas delivered to the various natural gas Sales Point(s) into the interstate pipelines," the plaintiffs assert that Santanna breached the agreement by "[c]harging prices other than the lowest monthly market price for natural gas." Amended Complaint ¶ 61. But as the passage quoted above clearly reveals, § 3.1 of the contract did not obligate Santanna to charge *the* lowest monthly market price. The verb "base" means "to use as a base or basis for," *see Webster's Third New International Dictionary* 180 (1971); *see also id.* 181 ("BASE now usu. applies to what underlies a belief, a system of thought, a judgment, a hope, and so on ... <a tax *base* on prospective earnings"); *The Random House Dictionary of the English Language* 172 (2d ed.1987) (stating that the verb "base" means "to place or establish on a base or basis; ground; found (usually fol. by *on* or *upon* )"), and the noun "base" is typically defined as a "foundation," or "that on which something rests or stands." *Webster's Third New International Dictionary* 180 (1971); *see also The Random House Dictionary of*

*the English Language* 172 (2d ed.1987); *Black's Law Dictionary* 151 (6th ed.1990) (both containing a similar definitions). By requiring Santanna to charge rates which were *based on* the monthly market price, § 3.1 of the Gas Sales Contract obliged Santanna only to charge rates which bore some relation to the monthly market price, not to charge rates that were identical to the lowest monthly market price. Of course, Santanna may have breached the contract by charging rates that were altogether divorced from the monthly market price; to date, however, the plaintiffs have not made such a claim. Accordingly, insofar as it is premised on an alleged breach of Petri's Gas Sales Contract, Count I is dismissed.

## II. Counts II (Illinois Consumer Fraud and Deceptive Business Practices Act) and III (Texas Deceptive Trade Practices–Consumer Protection Act)

### A. Rule 12(b)(6)

#### 1. Count II

■ The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices." 815 ILCS 505/2 (West 1993).[7] The Act is designed "to eradicate 'all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers,'" *Lee v. Nationwide Cassel, L.P.*, 277 Ill.App.3d 511, 213 Ill.Dec. 837, 660 N.E.2d 94, 100 (1995) (quoting *Warren v. LeMay*, 142 Ill.App.3d 550, 96 Ill.Dec. 418, 491 N.E.2d 464, 471 (1986)), *rev'd in part*, 174 Ill.2d 540, 221 Ill.Dec. 404, 675 N.E.2d 599 (1996); *see also Lyne v. Arthur Andersen & Co.*, 772 F.Supp. 1064, 1067–68 (N.D.Ill.1991); *Law Offices of William J. Stogsdill v. Cragin Fed. Bank for Sav.*, 268 Ill.App.3d 433, 206 Ill.Dec. 559, 645

---

**6.** Both Petri and Todd have asserted breach of contract Claims based on their respective agency agreements. Only Petri has asserted a breach of contract claim based on the gas sales contract.

**7.** 815 ILCS 505/2 reads in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, misrepresentation or

the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby....

N.E.2d 564, 565 (1995) (both explaining that the aim of the Act is to protect "consumers, borrowers and businessmen" against fraud, acts of deception, and unfair competitive practices), and thus "provides broader consumer protection than an action for common law fraud." *Moore v. Fidelity Fin. Services, Inc.,* 949 F.Supp. 673, 679 (N.D.Ill.1997); *accord Barille,* 224 Ill.Dec. 557, 682 N.E.2d at 124; *Perona v. Volkswagen of Am., Inc.,* 292 Ill.App.3d 59, 225 Ill.Dec. 868, 684 N.E.2d 859, 864 (1997). To establish a violation of the ICFA, a plaintiff must show that (1) the defendant committed a deceptive act, such as the misrepresentation or concealment of a material fact; (2) the defendant intended to induce the plaintiff's reliance on the deception; and (3) the deception occurred in a course of conduct involving trade or commerce. *Thacker v. Menard, Inc.,* 105 F.3d 382, 386 (7th Cir.1997); *Tibor Mach. Products v. Freudenberg–Nok Gen. Partnership,* 942 F.Supp. 1165, 1172 (N:D.Ill.1996) (Grady, J.); *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (1996); *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 213 Ill.Dec. 304, 658 N.E.2d 1325, 1335 (1995).

The defendants maintain that the complaint fails to state a cognizable claim under the ICFA for three reasons. First, the defendants argue that the plaintiffs' claim is at best one for breach of contract rather than for fraud, and that Count II is insufficient because it fails to "alleg[e] conduct implicating consumer protection concerns." Santanna Memorandum at 7–8; Santanna Reply at 5. Second, the defendants argue that the passage in their brochures indicating that "a customer can save 15% to 35%. on annual gas bills" is neither false nor a statement of fact. *Id.* at 8–9; Santanna Reply at 6. Third, the individual defendants argue that officers generally cannot be held responsible for their corporation's ICFA violations, and that the complaint fails to allege that Gatlin, Smith, or Pajares committed any specific acts of decep-

tion. Memorandum of Law In Support Of The Motion To Dismiss Of Defendants T. Wayne Gatlin, Jesse D. Smith And Jerry Pajares ("Individual Defendants Memorandum") at 13–14; Reply Memorandum In Further Support Of The Motion To Dismiss Of Defendants T. Wayne Gatlin, Jesse D. Smith And Jerry Pajares ("Individual Defendants Reply") at 9.

■ The defendants' first argument—that the plaintiffs have alleged no more than a simple breach of contract claim and have not established a nexus between the defendants' conduct and consumer protection concerns—is unavailing. True, the ICFA "was not intended to provide a remedy for ordinary common law breach of contract actions." *Stern v. Great Western Bank,* 959 F.Supp. 478, 486 (N.D.Ill.1997); *see also Stogsdill,* 206 Ill.Dec. 559, 645 N.E.2d at 567 ("Every individual breach of a contract between two parties does not amount to a cause of action under the Act."); *Bankier v. First Fed. Sav. & Loan Ass'n of Champaign,* 225 Ill.App.3d 864, 167 Ill.Dec. 750, 588 N.E.2d 391, 398 (1992) (citing additional Illinois cases). We may also assume *arguendo* that "[w]here a dispute involves two businesses that are not consumers," the test for sufficiency under the ICFA is " 'whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.' " *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.,* 275 Ill.App.3d 452, 211 Ill.Dec. 299, 654 N.E.2d 1109, 1115 (1995) (quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 137 Ill.Dec. 409, 546 N.E.2d 33, 41 (1989)); *see also Athey Products Corp. v. Harris Bank Roselle,* 89 F.3d 430, 436–37 (7th Cir.1996); *Scarsdale Builders, Inc. v. Ryland Group, Inc.,* 911 F.Supp. 337, 340–41 (N.D.Ill.1996); (both adopting the "consumer nexus" test as articulated in *Lake County* ).[8] But neither of

---

8. We previously held in *Tibor* that a plaintiff need not allege a "nexus" between the defendant's conduct and consumer protection concerns to sustain a claim under the Act. We reached this conclusion because (1) "the Illinois Supreme Court has not yet spoken on the issue

and the intermediate appellate courts have not provided clear direction on how the highest state court would rule," and (2) the plain language of the statute reveals that a plaintiff need not establish a "general injury to consumers" in order to prevail on an ICFA claim. 942 F.Supp. at 1173.

those canons of statutory construction necessitates the dismissal of the plaintiffs' ICFA claim. First, Count II simply cannot be classified as a garden variety breach of contract claim. If the plaintiffs were merely alleging that Santanna regularly entered into contracts it had no intention of fulfilling, their ICFA claim would be suspect. However, the plaintiffs allege not just that the defendants regularly breached their natural gas contracts, but also that the defendants lured consumers into signing those contracts by disseminating promotional brochures containing misrepresentations of material facts. *See also infra* at 34–38 (discussing the defendants' "breach of contract" rationale in relation to Count III). If proved, these allegations would entitle the plaintiffs to relief under the Act. *Cf. Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 350 (N.D.Ill.1997) (refusing to dismiss an ICFA claim because the complaint alleged that the defendants "misrepresented the prices [the plaintiff] would be charged by falsely claiming that their prices were lower than those of alternative suppliers"); *Mitchell v. Norman James Constr. Co.*, 291 Ill.App.3d 927, 225 Ill.Dec. 881, 684 N.E.2d 872, 883 (1997) (refusing to dismiss an ICFA claim which alleged that the defendant made false representations, concealed defective work, and failed to schedule required inspections "all to induce the plaintiff to enter into the contract in the first instance"); *Rumford v. Countrywide Funding Corp.*, 287 Ill.App.3d 330, 222 Ill. Dec. 757, 678 N.E.2d 369, 373 (1997) (finding that the plaintiff's claim "was not based on a simple breach of contract but on an allegation that defendant was engaged in a pattern of misrepresenting to customers that additional charges would not be assessed"); *Borcherding v. Anderson Remodeling Co.*, 253 Ill.App.3d 655, 191 Ill.Dec. 699, 624 N.E.2d 887, 892 (1993) (refusing to dismiss an ICFA claim because the plaintiffs adequately alleged that the defendant "made several false material statements which induced them to enter into a remodeling contract"); *see generally Stern*, 959 F.Supp. at 486 ("The Consumer Fraud Act has been properly applied in cases where a defendant made affirmative misrepresentations to the plaintiffs."). Second, the consumer nexus test is inapplicable because the dispute at hand does not involve "two businesses that are not consumers." *See Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F.Supp. 1358, 1368 (N.D.Ill. 1996) (emphasizing that the test "applies only to a Consumer Fraud Act action by a business that is not a consumer of the other business's products"). Section 505/1(e) of the Act broadly defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household," *see also Stogsdill*, 206 Ill.Dec. 559, 645 N.E.2d at 566 (highlighting the Act's "broad statutory definition of consumer"),[9] and Illinois courts frequently emphasize that the terms of the Act should be "liberally construed." *Connick*, 221 Ill.Dec. 389, 675

---

However, our ruling in *Tibor* appears to be inconsistent with a subsequent Seventh Circuit decision, and we are of course bound to follow the latter. In *Athey*, the district court dismissed an ICFA claim because the plaintiff had not alleged that the defendant's practices were directed to the market generally or otherwise implicated consumer protection concerns. On appeal, the plaintiff did not attempt to establish a "consumer nexus," but instead argued that the "nexus" requirement was (1) contrary to the ICFA itself; and (2) unwarranted because Illinois case law was unsettled as to the meaning of conduct "directed to the market generally." 89 F.3d at 436. The Seventh Circuit explained that

> [a]lthough the Illinois Supreme Court has not had occasion to speak on the subject, the intermediate appellate courts have. Those courts and federal district courts in Illinois have uniformly held that claims under the Act must meet the consumer nexus test by alleging that the conduct involves trade practices directed to the market generally or otherwise implicates consumer protection concerns. [The plaintiff] has failed to allege the necessary between the complained of conduct and consumer protection concerns, and therefore summary judgment was properly granted to [the defendant] on [the plaintiff's] claim under the Deceptive Practices Act.

*Id.* at 436–37.

9. Section 505/1(c) of the Act states that the term "person" includes, among other things, a "partnership, corporation (domestic and foreign), company, trust, [or] business entity or association." Section 505/1(b) provides that "merchandise" includes "any objects, wares, goods, commodities, intangibles, real estate situated outside the state of Illinois, or services."

N.E.2d at 594; *Johnston v. Anchor Org. for Health Maintenance,* 250 Ill.App.3d 393, 190 Ill.Dec. 268, 621 N.E.2d 137, 140 (1993); *see also Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 749 F.Supp. 869, 877–78 (N.D.Ill.1990) (honoring "the Act's broad definitional sweep and explicit mandate of liberal construction" while interpreting the statutory definition of "consumer"). Since Petri and Todd purchased natural gas for use in the buildings they own, and since Petri and Todd only lease apartments and do not resell the gas, they appear to qualify as "consumers" and are thus protected by the ICFA. Furthermore, even if we were to require a consumer nexus, the complaint would still pass the test. According to the plaintiffs, the defendants for several years have (1) distributed "hundreds or thousands of copies" of the brochures containing the alleged misrepresentations to prospective customers, *see* Amended Complaint ¶ 18; (2) used a limited number of standard-form agency agreements and gas sales contracts, *see id.* ¶ 28; and (3) observed a "policy and practice" of misrepresenting the savings customers can achieve by purchasing natural gas from Santanna. *See id.* ¶¶ 49–50. This alleged conduct surely implicates consumer protection concerns.

■■■ The defendants' second argument fares no better. The defendants contend that their statement in the promotional brochures that a customer can save 15% to 35% on annual gas bills "is clearly an expression of opinion of what *can* (not will) happen in the future, and ... [s]uch expressions of opinion are not actionable in fraud." Santanna Memorandum at 8–9 (emphasis in original).[10] The defendants also contend that the statement is not false, since the plaintiffs have admitted that consumers can, in fact, expect to save up to 15%. *Id.* at 9 (citing paragraphs 20 and 21 of the Amended Complaint); Santanna Reply at 6. Again, as a matter of hornbook law it is true that mere expressions of opinion, or "puffing," are not actionable under the ICFA. *In re Estate of*

*Albergo,* 275 Ill.App.3d 439, 211 Ill.Dec. 905, 656 N.E.2d 97, 107 (1995) (citing *Sohaey v. Van Cura,* 240 Ill.App.3d 266, 180 Ill.Dec. 359, 607 N.E.2d 253, 272 (1992)); *Evanston Hosp. v. Crane,* 254 Ill.App.3d 435, 193 Ill. Dec. 870, 627 N.E.2d 29, 36 (1993). But "[a] statement that would otherwise be an opinion can constitute a statement of fact if it is made in such a way that the consumer could reasonably treat it as a statement of fact." *Borcherding,* 191 Ill.Dec. 699, 624 N.E.2d at 892; *see also Thacker,* 105 F.3d at 386 (quoting *Totz v. Continental Du Page Acura,* 236 Ill.App.3d 891, 177 Ill.Dec. 202, 602 N.E.2d 1374, 1382 (1992)). Consequently, we need not consider any fine grammatical distinctions between the verbs "can," "may," or "will," since the plaintiffs reasonably could have treated the defendants' statement that customers could save between 15% and 35% on annual bills as one of fact. Moreover, the plaintiffs allege only that the brochures gave the impression that the *potential* (not necessarily actual) savings could be between 15% and 35% when in fact there was never any possibility of achieving these savings for the vast majority of Santanna customers. The defendants' other point (that the statement is not actionable because the plaintiffs have conceded that customers can save up to 15%) is wholly unconvincing. The plaintiffs allege that the defendants' literature informs readers that they can save a *minimum* of 15%, when in reality 15% is the *maximum* amount they can expect to save by selecting Santanna as their supplier. That a customer could fall within the defendants, inflated range of 15% to 35% in the event he achieved the maximum possible savings of 15% does not mean that the brochures could not have been misleading.

■■■ The individual defendants' third argument—that the plaintiffs' allegations are insufficient under Rule 12(b)(6) to render Gatlin, Smith, or Pajares liable for any ICFA violations committed by Santanna—also misses the mark. As the defendants note in

10. The defendants also argue that the plaintiffs have not alleged that they relied on the "15% to 35% savings" statement or the statement that "Santanna guarantees that the price per therm will never be greater than the utility company."

Santanna Memorandum at 9. However, a plaintiff need not prove actual reliance on a deceptive act to prevail on an ICFA claim. *Thacker,* 105 F.3d at 386; *Tibor,* 942 F.Supp. at 1172; *Barille,* 224 Ill.Dec. 557, 682 N.E.2d at 124.

their brief, the general rule in Illinois is that "while a corporation can be held liable for the acts of its agents, the directors or officers cannot be held individually liable unless they participated in the conduct giving rise to that liability." *Prince v. Zazove,* 959 F.2d 1395, 1401 (7th Cir.1992); *see also Washington Courte Condominium Ass'n–Four v. Washington–Golf Corp.,* 267 Ill.App.3d 790, 205 Ill.Dec. 248, 643 N.E.2d 199, 217 (1994) (stating that a corporate officer is liable "for the torts of the corporation in which he actively participates"); *see generally Itofca, Inc. v. Hellhake,* 8 F.3d 1202, 1204 & n. 6 (7th Cir.1993) (remarking that "[t]his has been the rule of law in Illinois for over sixty years"). But there are two problems with the defendants' position. First, most of the authorities upon which the defendants rely are inapposite, because Count II involves a statutory claim, not a tort claim. *Garcia v. Overland Bond & Inv. Co.,* 282 Ill.App.3d 486, 218 Ill.Dec. 36, 668 N.E.2d 199 (1996) expressly recognizes the distinction. *See id.* 668 N.E.2d at 199–200 (noting that "corporate employees are not vicariously liable for *tortious* acts of the corporation in which they do not participate" and emphasizing that the ICFA "confers a statutory right of action created by the legislature") (emphasis in original). Second, even if the traditional rules of tort liability do apply to statutory fraud claims, the complaint still passes muster. While the absence of specific facts linking the individual defendants to the alleged ICFA violations might be fatal to the plaintiffs' claim in an Illinois tribunal, that is not the case under the Federal Rules. To reiterate, in a notice pleading system a suit should not be dismissed so long as it is possible to hypothesize facts, consistent with the complaint, that would make out a claim for relief. *See supra* at 963, 964–65. The plaintiffs have at least generally alleged that the individual defendants were responsible for disseminating the brochures, *see* Amended Complaint ¶ 10; that they approved the representations in the brochures, *see id.* ¶ 19; and that they knew those representations were false. *See id.* ¶¶ 22, 25; *see also infra* at 974–975 (explaining that, for purposes of Rule 9(b), the plaintiffs are entitled to assume during the pleading stage that the individual defendants

were responsible for the brochures). No more is required under Rule 12(b)(6).

## 2. Count III

■ Not surprisingly, the Texas Deceptive Trade Practices–Consumer Protection Act in many ways parallels the Illinois Consumer Fraud and Deceptive Business Practices Act. The underlying purposes of the DTPA are "to protect consumers against false, misleading and deceptive business practices, and to provide efficient and economical procedures to secure such protection." *State Farm Fire and Cas. Co. v. Price,* 845 S.W.2d 427, 439 (Tex.App.1992); *accord Pope v. Rollins Protective Services Co.,* 703 F.2d 197, 201 (5th Cir.1983); *McClung v. Wal–Mart,* 866 F.Supp. 306, 310 (N.D.Tex.1994). The Act is to be "liberally construed" to achieve these goals. *Brandon v. American Sterilizer Co.,* 880 S.W.2d 488, 490 (Tex.App.1994); *Star Houston, Inc. v. Kundak,* 843 S.W.2d 294, 297 (Tex.App.1992) (citing *McKinley v. Drozd,* 685 S.W.2d 7, 11 (Tex.1985)). To establish a violation of the Act, a plaintiff must show that (1) he fits the statutory definition of "consumer;" (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a "producing cause" of the plaintiff's damages. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995); *LaBella v. Charlie Thomas, Inc.,* 942 S.W.2d 127, 134 (Tex.App.1997); *Cianfichi v. White House Motor Hotel,* 921 S.W.2d 441, 443 (Tex.App.1996). Misrepresentations of material facts are actionable under the DTPA so long as they are not merely "puffing" or expressions of opinion. *Sergeant Oil & Gas Co. v. National Maintenance & Repair, Inc.,* 861 F.Supp. 1351, 1362 (S.D.Tex.1994) (Crone, Mag. J.); *Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980); *Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 229 (Tex.App.1996). Finally, Texas courts adhere to the rule that "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false misleading or deceptive act' in violation of the DTPA." *Ashford Dev., Inc. v. USLife Real Estate Services Corp.,* 661 S.W.2d 933, 935 (Tex.1983); *accord*

*Dura–Wood Treating Co. v. Century Forest Indus., Inc.,* 675 F.2d 745, 756 (5th Cir.1982); *Bass v. Hendrix,* 931 F.Supp. 523, 534–35 (S.D.Tex.1996); *La Sara Grain Co. v. First Nat'l Bank of Mercedes, Tex.,* 673 S.W.2d 558, 565 (Tex.1984); *Chilton Ins. Co. v. Pate & Pate Enterprises, Inc.,* 930 S.W.2d 877, 889–90 (Tex.App.1996).

The defendants' arguments as to why the plaintiffs' DTPA claim should be dismissed are familiar. First, the defendants again contend that the plaintiffs' claim is at best one for breach of contract, and that "claims based upon failure to perform under a contract are not actionable under the DTPA." Santanna Memorandum at 10. Second, the defendants renew their argument that the plaintiffs have not alleged that Gatlin, Smith, or Pajares were personally responsible for the alleged misrepresentations, and that the lack of such personal involvement precludes a finding of individual liability. Individual Defendants Memorandum at 13–14; Individual Defendants Reply at 8–9. Because the defendants have adduced additional Texas authorities in support of their arguments, these points warrant further consideration.

■ The defendants' second argument— that Count III must be dismissed on a 12(b)(6) basis because Gatlin, Smith, and Pajares cannot be held responsible for any DTPA violations committed by Santanna— cannot carry the day. Citing *Light v. Wilson,* 663 S.W.2d 813, 814–15 (Tex.1983), and *Leitch v. Hornsby,* 885 S.W.2d 243, 249 (Tex. App.1994),[11] the defendants maintain that the owner of a corporation is not individually liable under the DTPA if he did not personally violate the Act. For the most part, that is an accurate statement of Texas law. *See Walker v. Federal Deposit Ins. Co.,* 970 F.2d 114, 122 (5th Cir.1992) (recognizing that an individual corporate agent may be held liable under the DTPA for "oral or written misrepresentations made by him" and for "any tortious conduct that he committed in connection with his corporate duties"); *Luevano v. Dow Corning Corp.,* 895 F.Supp. 135, 137 (W.D.Tex.1994) (citing additional Texas cases for the proposition that "a corporate officer

or employee may be personally liable for torts committed in the course of his employment"); *Portlock v. Perry,* 852 S.W.2d 578, 582 (Tex.App.1993) (stating that "a corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the tortious conduct, either actual or constructive") (citing, among other cases, *Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984)). As we previously noted in our discussion of the plaintiffs' ICFA claim, however, the plaintiffs have alleged that the individual defendants were responsible for and approved the misrepresentations in the brochures. *See supra* at 970. Since it is possible to hypothesize facts consistent with these allegations that would state a claim under the DTPA, we cannot dismiss Count III on the basis of the defendants' second argument.

■ The defendants' first argument— that the plaintiffs, claim is merely one for breach of contract and therefore cannot be a basis for relief under the DTPA—hinges on the Texas Supreme Court's recent decision in *Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12 (Tex.1996). That case largely revolved around a meeting in 1989 between James R. Willett, the president of Ace Sign, and Larry Crawford, a sales representative for the Southwestern Bell Yellow Pages. During the meeting, Crawford told Willett that (1) because Ace Sign had fallen behind in its previous payments, it would be required to pay in advance for a renewal of a Yellow Pages advertisement; (2) Ace Sign's Yellow Pages ad would be published upon payment of the contract price; (3) businesses like Ace Sign tend to be heavily dependent on Yellow Pages advertising; and (4) a Yellow Pages ad would increase Ace Sign's business by 70% to 80% during the next year. *Id.* at 13, 14, Willett then entered into a written agreement with Crawford, and paid the full contract price in advance. When Willett's ad did not appear in the 1989–90 Yellow Pages directories, he sued Crawford and several other defendants for breach of contract, negligence, and assorted violations of the DTPA.

---

**11.** The appellate court's judgment in *Leitch* was reversed by the Texas Supreme Court on December 13, 1996. *Leitch v. Hornsby,* 935 S.W.2d 114 (Tex.1996).

*Id.* at 13. The Texas Supreme Court, after noting that "courts and commentators have struggled to clarify the boundary between contract claims and other causes of action," held that

> [t]he essence of [the plaintiff's] allegations is that: (1) the defendants represented that they would perform under the contract, and (2) nonperformance means that they misrepresented that they would perform under the contract. To accept this reasoning, however, would convert every breach of contract claim into a DTPA claim.
>
> Crawford's statements were nothing more than representations that the defendants would fulfill their contractual duty to publish, and the breach of that duty sounds in contract. The statements themselves did not cause any harm. The failure to run the advertisement (the breach of the contract) actually caused the lost profits, and that injury is governed by contract law, not the DTPA. . . .
>
> [T]he sole evidence of . . . [a] violation is that the defendants' representative told Ace Sign that its ad would be published upon payment of the contract price. Under our decision in *Ashford*, this failure to fulfill a promise is actionable only under a breach of contract theory and not under the DTPA.

*Id.* at 13, 14–15.

■ *Crawford* is distinguishable from the case at bar. Most importantly, in *Crawford* the plaintiff did not allege that he had been lured into the advertising contract as a result of false representations. Although Willett later attempted to label the statements made by Crawford during the 1989 meeting as "misrepresentations," he made no allegation that any of Crawford's statements were false; Willett apparently had no reason to believe his business would *not* have increased by 70% to 80% if Crawford had lived up to his end of the bargain. As a consequence, the harm to Willett stemmed purely from Crawford's failure to publish the ad (i.e., the breach of the contract), not from Crawford's precontract sales pitch. The plaintiffs' allegations in this case are appreciably different. The gravamen of the complaint is that the defendants enticed the plaintiffs into signing the dotted lines on the natural gas contracts by making misrepresentations in their promotional literature. Omissions or misrepresentations which induce a party into a contractual agreement are actionable under the DTPA. *See Busse v. Pacific Cattle Feeding Fund # 1, Ltd.,* 896 S.W.2d 807, 817 (Tex. App.1995) (holding that an omission can constitute a deceptive act under the DTPA "if the failure to disclose was intended to induce the consumer to enter into the transaction"); *Banbury v. Omnitrition Int'l, Inc.,* 533 N.W.2d 876, 881 (Minn.Ct.App.1995) (holding that under the DTPA "[a] false statement that induces a party to sign a contract may be a deceptive act"); *see also Bekins Moving & Storage Co. v. Williams,* 947 S.W.2d 568, 577–78 (Tex.App.1997) (upholding a jury verdict in favor of a plaintiff who alleged that the defendant violated the DTPA by "ma[king] several misrepresentations that induced her to accept its bid to move her furniture" and that "without these representations she would not have engaged [the defendant] to move her property"); *see generally Kuehnhoefer v. Welch,* 893 S.W.2d 689, 693 (Tex.App.1995) (holding that an act which is "false, misleading or deceptive at the time the conduct occurs . . . differs from an ordinary breach of contract" and is thus sufficient to sustain a DTPA claim). In addition, the harm to the plaintiffs in the instant case stems at least in part from the defendants' alleged misstatements, not just from the defendants' alleged breaches of the contracts. To illustrate: In *Crawford,* Willett's basic beef was that Crawford neglected to publish Ace Sign's ad. The Texas Supreme Court had no occasion to consider what might have happened if (1) Crawford had in fact published the ad, and (2) Crawford knew at the time he executed the contract that his promises of increased business and greater savings for Willett were spurious. Here, the plaintiffs are alleging neither that the defendants failed to deliver the requisite amount of natural gas, nor that the gas supplied by the defendants was somehow unusable or substandard. Instead, they allege that they were harmed by entering into the contracts in the first instance, a course of action they would have avoided were it not for the defen-

dants' false representations. Accordingly, *Crawford* does not require the dismissal of the plaintiffs' DTPA claim.

## B. Rule 9(b)

■ Counts II and III are subject to the rigors of Rule 9(b). The rationales for the rule are relevant both to claims of common law fraud and to claims of statutory fraud, so a plaintiff must plead a violation of the ICFA with particularity. *Gerdes v. John Hancock Mut. Life Ins. Co.*, 712 F.Supp. 692, 702 (N.D.Ill.1989); *accord Appraisers Coalition v. Appraisal Institute*, 845 F.Supp. 592, 608–09 (N.D.Ill.1994); *Ramson v. Layne*, 668 F.Supp. 1162, 1170–71 (N.D.Ill.1987). A plaintiff asserting such a claim is therefore required to describe with reasonable specificity the circumstances in which the defendant allegedly misrepresented material facts. *Olympic Chevrolet, Inc. v. General Motors Corp.*, 959 F.Supp. 918, 920 n. 1 (N.D.Ill. 1997) (citing *Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.*, 940 F.Supp. 176, 180 (N.D.Ill.1996)). Because the DTPA is substantially similar to the ICFA, we assume *arguendo* that Rule 9(b) applies to statutory fraud claims under Texas law as well.[12]

The defendants contend that Counts II and III fail to pass muster under Rule 9(b) for three reasons. First, the individual defendants argue that the complaint impermissibly "lumps" them together and fails to describe their particular roles in the alleged fraud. Individual Defendants Memorandum at 3–4; Individual Defendants Reply at 1–3. Second, the defendants argue that the plaintiffs "have pled no specific facts" demonstrating the falsity of certain statements in the defendants' brochure. Santanna Memorandum at 5. Third, the defendants argue that some of the facts that *have* been alleged—for instance, the fact that several months elapsed between the execution of the contracts and the defendants' first purported breaches of those contracts—foreclose the plaintiffs' claim. Santanna Memorandum at 5–6; Individual Defendants Memorandum at 4.

The defendants' first argument—that Counts II and III are insufficient because they "lump" the individual defendants together and fail to identify the defendants' respective roles in the allegedly fraudulent scheme—requires a word of explanation. In support of their contention, the defendants rely primarily on the Seventh Circuit's 1994 decision in *Vicom*, 20 F.3d 771. In that case, the plaintiff, an organization which purchased and leased electronic credit card processing equipment, entered into a vendor agreement with a corporate defendant. The agreement provided that the defendant would identify prospective lessees and install processing equipment at the behest of the plaintiff. The plaintiff alleged that sales representatives and other officials of the defendant engaged in a fraudulent scheme by making a series of misrepresentations to merchants, by orally guaranteeing the leases of noncreditworthy merchants, and by falsely assuring the plaintiff that it was properly maintaining the equipment. *Id.* at 773–74. The Seventh Circuit affirmed the dismissal of two of the plaintiff's RICO claims under Rule 9(b), noting that "[m]any of the allegations simply state that the misrepresentations were made 'at the direction, under the supervision, or with the knowledge and consent' of all the defendants. Such pleading would appear to fall far short of the standards set forth in the caselaw." *Id.* at 777. The court commented that it had previously rejected a complaint which "lumped together" multiple defendants, *see id.* at 778 (citing *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir.1990)), and stated that "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* (citation omitted).

---

**12.** Some decisions from federal courts in the Fifth Circuit mention Rule 9(b) and the DTPA in the same breath. *E.g., Keith v. Stoelting, Inc.*, 915 F.2d 996, 998, 1000 (5th Cir.1990). Others intimate that claims under the Act must be pleaded with specificity. *See Washington v. United States Dep't of Hous. and Urban Dev.*, 953 F.Supp. 762, 770 (N.D.Tex.1996) (stating that a plaintiff may not rely on "global allegations" but rather "must specify [ ] how each Defendant committed the acts or omissions which form the basis of her fraud, misrepresentation and Deceptive Trade Practices claims"); *Waters v. State Farm Mut. Auto. Ins. Co.*, 158 F.R.D. 107, 108–09 (S.D.Tex.1994) (referring to Rule 9(b) while dismissing the plaintiffs' fraud claims on the basis of fraudulent joinder). Curiously, however, none of these cases squarely holds that claims asserted under the DTPA are subject to the rigors of Rule 9(b).

Seizing upon this language, the defendants in this case insist that the plaintiffs' claims should be dismissed because the complaint is "bereft of any facts as to what each defendant's role was in the purported fraud." Individual Defendants Memorandum at 4.

 The defendants' position is colorable, but ultimately unpersuasive. First, Rule 9(b)'s requirements may be relaxed when specific details are within the defendants, exclusive knowledge or control. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir.1994); *see also Rohlfing*, 172 F.R.D. at 347–48, 350 (relaxing 9(b)'s requirements as to RICO and ICFA claims based on allegedly fraudulent statements in a corporate brochure); *Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 880 F.Supp. 1202, 1208 (N.D.Ill.1995) (relaxing 9(b)'s requirements as to RICO claims based on allegedly fraudulent invoices); *Cobb v. Monarch Fin. Corp.*, 913 F.Supp. 1164, 1180 (N.D.Ill.1995) (holding, in an ICFA case involving allegedly misleading waivers, that when "corporate insiders are involved and the role of each insider is solely within their knowledge, the plaintiff need not specify the role of each defendant") (citation and internal marks omitted); *Endo v. Albertine*, 812 F.Supp. 1479, 1497 (N.D.Ill.1993) (rejecting the defendants' argument that the complaint unacceptably "lumped" them together and holding that "[p]laintiffs need not allege facts which are in the exclusive knowledge or control of the defendants"). Indeed, we ourselves noted in *Levine v. Prudential Bache Properties, Inc.*, 855 F.Supp. 924 (N.D.Ill. 1994) (Grady, J.) that the court in *Vicom*

> spoke approvingly of a line of cases interpreting Rule 9(b) and [held] that when a complaint implicates multiple defendants, it should not "lump together" the defendants but should inform each defendant of the nature of his or her participation in the alleged fraud. The appeals court recognized, though, that a plaintiff need not individualize the role of multiple defendants when the necessary information is "uniquely within the defendant's knowledge."

*Id.* at 930 (quoting *Vicom*, 20 F.3d at 777–78 & n. 5). That appears to be the situation here. The plaintiffs have alleged all of the details they reasonably could have been expected to allege—that the defendants distributed brochures containing misinformation to potential customers, *see* Amended Complaint ¶¶ 18–25, and that the plaintiffs received copies of the brochure prior to the time they entered into their contractual agreements with the defendants. *See id.* ¶¶ 26–27. The plaintiffs have attached a copy of the brochure to the complaint, *see id.* Exhibit B, and have specifically identified the statements in the brochures that are allegedly misleading. *See id.* ¶¶ 20, 23. At this juncture, the plaintiffs cannot be expected to know which individuals at Santanna drafted the brochures.

Second, a plaintiff may also clear Rule 9(b)'s hurdle "through reliance upon a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors." *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir.1995); *accord Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir.1997); *Blake v. Dierdorff*, 856 F.2d 1365, 1369 (9th Cir.1988). As a member of this court explained in *Morse v. Abbott Laboratories*, 756 F.Supp. 1108 (N.D.Ill.1991), "in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to assume that these are the collective actions of the officers." *Id.* at 1111 (citing, *inter alia, Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987)); *accord Golden v. Terre Linda Corp.*, No. 95 C 657, 1996 WL 426760, at *4 (N.D.Ill. July 26, 1996); *Miller v. Loucks*, No. 91 C 6539, 1992 WL 329313, at *9 (N.D.Ill. Nov.5, 1992); *Latimer v. Hall Fin. Group, Inc.*, No. 90 C 156, 1990 WL 133225, at *5 (N.D.Ill. Sept.13, 1990). The brochures in this case appear to fit the "group-published" mold. Moreover, the plaintiffs have generally alleged that the individual defendants "were aware of and approved" the misstatements in the brochures, *see* Amended Complaint ¶¶ 19, 22, 25; *see also id.* ¶ 10 (alleging that the individual defendants "were personally familiar with and responsible for" the pamphlets). It

seems reasonable to presume, at least during the initial phases of the litigation, that the corporate officers at Santanna either drafted, approved, or distributed the brochures.

Third, under Rule 9(b) "[p]erhaps the most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading." 5 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 1288, at 648 (2d ed.1990); *see also Vicom*, 20 F.3d at 777–78 (quoting Wright & Miller); *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 873 F.Supp. 111, 119 (N.D.Ill.) (stressing that the provision of adequate notice to an adverse party is "one of the Rule's core purposes"), *aff'd*, 67 F.3d 605 (7th Cir.1995); *Levine*, 855 F.Supp. at 931 ("[A] complaint does not run afoul of Rule 9(b) if the defendants can make enough sense of it so that they may mount an answer or defense."); *Endo*, 812 F.Supp. at 1497 (affirming that the purpose of the rule "is to apprise the party alleged to have committed fraud of the charges" and to permit that party to formulate a response). This is not a case in which the plaintiffs' failure to provide additional specific details implicates the objectives of the rule. The plaintiffs' fraud allegations are neither cryptic nor confusing. The plaintiffs have specified the alleged misrepresentations and have attached a copy of the document in which the alleged misrepresentations appear. Aside from the Santanna Natural Gas Corporation, only three individuals are named as defendants. The complaint is sufficiently particular to inform the defendants of the nature of the claims against them, and those defendants are entirely capable of drafting an adequate response. It is thus unlikely that Counts II and III are merely pretexts "to force a quick settlement or to allow discovery which may uncover unknown wrongs." *Reshal Associates, Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226, 1232 (N.D.Ill. 1990); *see also Davis v. Coopers & Lybrand*, 787 F.Supp. 787, 793 (N.D.Ill.1992) (commenting that flexibility under Rule 9(b) is particularly appropriate for a case "which clearly does not involve plaintiffs coming to court with concocted allegations as a pretext

for discovery of unknown wrongs") (citation and internal marks omitted). To dismiss the plaintiffs' statutory fraud claims at this time would therefore be contrary to the general principle that Rule 9(b) must not be read blindly, but instead should be applied in order to effectuate the purposes of the rule. *A.I. Credit Corp. v. Hartford Computer Group, Inc.*, 847 F.Supp. 588, 597 (N.D.Ill. 1994); *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 814 F.Supp. 720, 726 (N.D.Ill.1993); *Reshal*, 754 F.Supp. at 1230.

■ The defendants' second argument—that the plaintiffs have neglected to plead specific facts to support their claims that the "15% to 35% savings" and "lowest monthly market price" representations were false—need not detain us. While Rule 9(b) dictates that a complaint must set forth the *content* of any purported misrepresentations, *see Vicom*, 20 F.3d at 777, the rule "does not require a plaintiff to plead facts that if true would show that the defendant's alleged misrepresentations were indeed false." *Uni\*Quality*, 974 F.2d at 923; *accord Bankers Trust*, 959 F.2d at 683; *Whirlpool*, 873 F.Supp. at 118 n. 11. Again, as we remarked in *Levine*, "[t]he Seventh Circuit has never held that Rule 9(b) requires the parties to plead their theory of the case; they generally need not make allegations detailing the parties' relationship or the falsity of the misrepresentations or omissions." 855 F.Supp. at 931 (citing *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir.1993)). In the case at hand (and as discussed in the preceding paragraphs), the plaintiffs have precisely identified the defendants' allegedly fraudulent statements. *See* Amended Complaint ¶¶ 20, 23, Exhibit B. Whether the plaintiffs can establish that those representations were actually false is an issue for another day.

■ The defendants' third argument—that the delay between Santanna's dissemination of the brochures and Santanna's alleged overbilling of the plaintiffs rebuts any inference of fraudulent intent—proceeds along the following lines. Todd executed his contracts with Santanna in July 1993, "and presumably also would have received the repre-

sentations in Santanna's marketing materials at or about that time." Santanna Memorandum at 5. However, Todd claims that Santanna first overcharged him in February 1996, approximately 30 months later. Petri executed her contracts with Santanna in November 1995, but claims that Santanna first overbilled her two months later, in early 1996. According to the defendants, these "temporal gaps" negate any inference that they knew their representations were false when they distributed the brochures. *Id.* at 6.

The force of the defendants' point is greatly diminished by a technical defect. In their briefs, neither Santanna nor the individual defendants have cited any law to support their position. The defendants cite one (and only one) case in their memoranda—*Morrison v. Perschke*, No. 96 C 1276, 1996 WL 109777 (N.D.Ill. March 8, 1996). That decision in no way buttresses the defendants' argument. Nothing in *Morrison* even comes close to suggesting that a plaintiff must "plead facts to support an inference of fraudulent intent." *See* Santanna Reply at 2. Nor does it suggest that a "temporal gap" necessarily "demolishes" an inference of fraudulent intent. *See* Santanna Memorandum at 6.[13] Although this does not automatically resolve the issue in the plaintiffs' favor, it does bring to mind the Seventh Circuit's twin warnings that "[the] court has no duty to research and construct legal arguments available to a party," *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir.1995) (applying Federal Rule of Appellate Procedure 28), and that "a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." *Doe v. Johnson*, 52 F.3d 1448, 1457 (7th Cir.1995) (same, quoting *Littlefield v.*

*McGuffey*, 954 F.2d 1337, 1342 (7th Cir. 1992)); *see also United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) (commenting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

Aside from that problem, the defendants' argument suffers from two additional flaws. First, the text of Rule 9(b) counsels against dismissal for failure to plead fraudulent intent with specificity. The rule is explicit: "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b); *see also Levine*, 855 F.Supp. at 935 (recognizing that "Rule 9(b) requires only a general averment of knowledge"). Second, the complaint affords an adequate basis for inferring that the defendants acted with fraudulent intent. Our previous rulings in this section of the opinion—that (1) the plaintiffs are not required at this point to demonstrate that the defendants' alleged misrepresentations were false, (2) the plaintiffs have sufficiently alleged that the defendants attempted to lure customers into contractual agreements by disseminating misleading brochures, and (3) the plaintiffs have sufficiently alleged that the defendants promised consumers savings of 15% to 35% on annual bills even though the defendants knew that the actual savings would be no greater than 15%—make that conclusion almost inescapable. What inference should the court draw based on the time period between the execution of the contracts and the first alleged breaches of those contracts? It may very well be, as the defendants contend, that these temporal gaps indicate that they had no knowledge of the allegedly false representations in the brochures and that they did not enter into the contracts intending to charge inflated prices. On the other hand, it might also be

**13.** In *Morrison* the court ordered the plaintiff to cure a number of defects in Count IV of his complaint, which was styled as a RICO action. The court's entire discussion of the RICO claim occupies a single paragraph:

In this instance Count IV seeks to link up Perschke's asserted defrauding of an investor other than Morrison during a period beginning sometime in 1984 and ending in March 1985 with some Perschke–Morrison relationship that began some years later (in late 1987),

claiming that those episodes form the "pattern of racketeering activity" that constitutes an essential element of a RICO violation. Morrison's Complaint has also substituted some generalized references to mail fraud and wire fraud for the type of particularity that is mandated by Rule 9(b). Nor does Count IV clarify the person-enterprise relationship on which Morrison must hinge and RICO claim under Section 1962(c).

1996 WL 109777 at *1.

that "Santanna's conduct suggests that it was hoping to lure plaintiffs into a sense of false security by charging them the promised rates before embarking on its fraudulent scheme to impose greater charges than those promised." Plaintiffs' Response To Defendant Santanna Natural Gas Corporation's Motion To Dismiss ("Response to Santanna") at 7. Taking a position on this factual issue during the pleading stage would be inappropriate to begin with, and would be especially so since the court has not been schooled on the workings of (and the customary practices in) the market for natural gas. The defendants' motion to dismiss Counts II and III on a Rule 9(b) basis is denied.

▮▮▮▮ Before we move on to the plaintiffs' next claim, two additional comments are necessary. First, as stated in the introductory section of this opinion, the plaintiffs have asserted five grounds for relief under both the DTPA and the ICFA. *See supra* at 962. The second and third grounds relate to the defendants' promotional materials and brochures, which have been the focus of our discussion thus far. The first, fourth, and fifth grounds, however, *are* essentially allegations that the defendants breached the Gas Sales Contracts and the Agency Agreements, and cannot form the basis of a DTPA claim or an ICFA claim. Counts II and III are therefore dismissed insofar as they are premised on grounds one, four, and five. Second, in its reply brief, Santanna raises several arguments that were not included in its opening memorandum.[14] Because these arguments appear for the first time in Santanna's reply, the plaintiffs have not had an opportunity to respond to them. To dismiss the complaint on the basis of these new arguments would be patently unfair. *See Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245, 1250 (7th Cir.1996) (holding, pursuant to Circuit Rule 28(f), that an appellant "cannot circumvent the adversarial process by raising new arguments in reply" because "[t]he appellee would have no opportunity to respond to the new claims"); *see also Estate*

*of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir.1997) ("[A]rguments raised for the first time in the reply brief are waived.") (citation omitted); *accord Kastel v. Winnetka Bd. of Educ., Dist. 36*, 946 F.Supp. 1329, 1335 (N.D.Ill.1996); *United States v. Joiner*, 847 F.Supp. 604, 607 (N.D.Ill.1994), *aff'd*, 78 F.3d 586, 1996 WL 89218 (7th Cir. 1996). We therefore decline to address these points.

## C. Count IV: Breach of Fiduciary Duty

The components of a breach of fiduciary duty claim need little elaboration. A fiduciary duty is "[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person." *Black's Law Dictionary* 625 (6th ed.1990); *see also Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir.1992) (defining a fiduciary duty as "the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith"). Illinois courts require a plaintiff asserting such a claim to show (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) an injury resulting from the breach. *LaSalle Bank Lake View v. Seguban*, 937 F.Supp. 1309, 1324 (N.D.Ill. 1996); *see also Kirkland & Ellis v. CMI Corp.*, No. 95 C 7457, 1996 WL 559951, at *10 (N.D.Ill. Sept.30, 1996) (denying a breach of fiduciary duty claim because the plaintiff failed to prove proximate causation and damages); *Anderson v. Mortell*, 722 F.Supp. 462, 472 (N.D.Ill.1989) (same). Texas courts require a similar showing. *See, e.g., Coble Wall Trust Co. v. Palmer*, 859 S.W.2d 475, 481–82 (Tex.App.1993) (disposing of the plaintiffs' claim because no evidence demonstrated that (1) the defendants breached a fiduciary duty and (2) the breach proximately caused the plaintiffs' damages); *Howell v. Homecraft Land Dev., Inc.*, 749 S.W.2d 103, 109 (Tex.App.1987) (holding that the beneficiary of a fiduciary duty must "show that he suffered damages as a result of a breach of that fiduciary duty").

---

14. For example, on page 8 of its reply brief, Santanna argues that under the DTPA "a consumer seeking relief in connection with an alleged deceptive act or practice must have relied on such act or practice to his or her detriment."

*See also id.* at 9, 10–11 (asserting the same argument). Likewise, on page 10 of its reply, Santanna argues that the statements in the pamphlets are no more than "future predictions," and are not actionable under the DTPA.

The defendants' argument for the dismissal of Count IV is twofold. First, the defendants contend that because the contracts at issue did no more than establish a simple purchaser-seller relationship, "Santanna, as a seller of natural gas, does not owe fiduciary responsibilities to Plaintiffs, its customers." Santanna Memorandum at 12. Second, and in the alternative, the defendants argue that the scope of any agency relationship is limited to the duties created by the parties' contracts, and that under the Agency Agreements "Santanna's duties as agent are limited to receiving and reviewing its customers' monthly statements from the LDCs and working to correct any discrepancies in such statements." *Id.* at 14; *see also id.* at 15 (stating that Santanna's only arguable fiduciary duty was the proper handling of monthly bills).[15]

The defendants' first argument— that Santanna did nothing more than agree to sell consumers certain quantities of natural gas—is without merit. While it is true as a general matter that "parties to a contract are not each other's fiduciaries," *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 280 (7th Cir.1992); *Stuart Park Associates Ltd. Partnership v. Ameritech Pension Trust,* 846 F.Supp. 701, 714 (N.D.Ill.1994) (quoting *Original* ), it is likewise true that an action for breach of fiduciary duty "is controlled by the substantive laws of agency, contract and equity." *Capitol Indem. Corp. v. Stewart Smith Intermediaries, Inc.,* 229 Ill.App.3d 119, 171 Ill.Dec. 52, 593 N.E.2d 872, 876 (1992) (citing *Kinzer v. City of Chicago,* 128 Ill.2d 437, 132 Ill.Dec. 410, 539 N.E.2d 1216, 1220 (1989)); *accord Doe v. Roe,* 289 Ill. App.3d 116, 224 Ill.Dec. 325, 681 N.E.2d 640, 649 (1997); *American Envtl., Inc. v. 3–J Co.,* 222 Ill.App.3d 242, 164 Ill.Dec. 733, 583 N.E.2d 649, 653 (1991). Here, the parties' self-titled "Agency Agreements" did more than memorialize a sale of natural gas; the agreements clearly created an agency relationship between Petri, Todd, and Santanna. The text of those agreements, which is set forth in the margin,[16] reveals that Santanna's

---

15. The defendants also contend that "Plaintiffs' breach of fiduciary claim fails to satisfy Rule 9(b) particularity requirements for the same reasons their [I]CFA claim fails." Santanna Memorandum at 11. Breach of fiduciary duty claims are indeed subject to Rule 9(b). *Thornton v. Evans,* 692 F.2d 1064, 1083 n. 43 (7th Cir.1982); *see also In re General Instrument Corp. Sec. Litig.,* No. 96 C 1129, 1997 WL 610452, at *10 (N.D.Ill. Sept.24, 1997) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary.") (quoting *Frota v. Prudential–Bache Securities, Inc.,* 639 F.Supp. 1186, 1193 (S.D.N.Y.1986)); *LaSalle Nat'l Bank v. Metropolitan Life Ins. Co.,* No. 91 C 2041, 1991 WL 126287, at *2 (N.D.Ill. July 2, 1991) (Grady, J.) ("When the conduct underlying a claim of breach of fiduciary duty constitutes fraud, the particularity requirement of Fed.R.Civ.P. 9(b) applies to the complaint."). However, because the defendants have simply incorporated by reference the same arguments they asserted against Counts II and III, our previous analysis of the sufficiency of those counts under Rule 9(b) is equally applicable to Count IV.

16. Todd's Agency Agreement reads in relevant part:

**AGENCY AGREEMENT**

THIS **AGENCY AGREEMENT,** made and entered into this 20th day of July, 1993 by and between **JOHN R. TODD** (herein referred to as "**COMPANY**") and **SANTANNA NATURAL GAS CORPORATION** (herein referred to as "**AGENT**").

**WITNESSETH**

**WHEREAS, COMPANY** has selected **AGENT** to act on its behalf to secure certain information from **COMPANY'S** Local Distribution Company (LDC); and

**WHEREAS, AGENT** agrees to gather certain information from **COMPANY'S** LDC in order to maintain the account; and

**WHEREAS, COMPANY and AGENT** desire to enter into an **AGENCY AGREEMENT** relating to the sale, billing and transportation of natural gas through the **COMPANY'S** LDC.

*ARTICLE I*
*PROCEDURE*

1.1 **AGENT** agrees to contact LDC and inform them that **AGENT** has the authority to receive the monthly natural gas statement and any information pertinent to said statement to include but not limited to: information concerning invoicing, storage, and transportation of **COMPANY'S** account.

1.2 **COMPANY** agrees to pay one consolidated statement to AGENT as per **ARTICLE VII BILLING AND PAYMENTS,** of **GAS SALES CONTRACT** dated July 20, 1993.

*ARTICLE II*
*AGENT'S RESPONSIBILITY*

2.1 **AGENT** agrees to receive from LDC the **COMPANY'S** monthly natural gas invoice statement.

2.2 **AGENT** shall review said invoice statement for accuracy of charges, volumes of gas received and storage balances.

obligations included (1) receiving the plaintiffs' monthly invoice statements and any information pertinent to those statements from the LDC; (2) reviewing the invoice statements on the plaintiffs' behalf to confirm that the statements contained accurate charges for and volumes of natural gas; and (3) informing the plaintiffs of any discrepancies in the invoice statements while attempting to resolve those discrepancies. This appears to fit the standard definition of an agency relationship "created by express or implied contract or by law, whereby one party delegates the transaction of some lawful business with more or less discretionary power to another, who undertakes to manage the affair and to render to him an account thereof." *Black's Law Dictionary* 62 (6th ed.1990); *see also id.* (defining an agency relationship as one in which a party is "authorized to do certain acts for" another, or one in which a person "confides the management of some affair, to be transacted on his account, to [an] other party").[17] Illinois law then bridges the gap: " 'Once an agency relationship is found, a fiduciary relationship arises as a matter of law.' " *Peterson v. H & R Block Tax Services, Inc.*, 971 F.Supp. 1204, 1213 (N.D.Ill. 1997) (quoting *Letsos v. Century 21–New West Realty*, 285 Ill.App.3d 1056, 221 Ill.Dec. 310, 675 N.E.2d 217, 224 (1996)); *see also Ray v. Winter*, 67 Ill.2d 296, 10 Ill.Dec. 225, 367 N.E.2d 678, 682 (1977) (commenting that "where one voluntarily acts as an agent for another, a fiduciary relationship exists as a matter of law"); *accord Hofferkamp v. Brehm*, 273 Ill.App.3d 263, 210 Ill.Dec. 405, 652 N.E.2d 1381, 1388 (1995). Texas law is in accord. *See Matter of Carolin Paxson Adver., Inc.*, 938 F.2d 595, 597 (5th Cir.1991) (holding that under Texas law "[a]gency is a fiduciary relationship"); *Southland Lloyd's Ins. Co. v. Tomberlain*, 919 S.W.2d 822, 831 (Tex.App.1996) ("An agency creates a fiduciary relationship as a matter of law.") (citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513 (1942)); *Hartford Cas. Ins. Co. v. Walker County Agency, Inc.*, 808 S.W.2d 681, 687 (Tex.App. 1991) ("Inherent in any agency relationship

2.3 **AGENT** agrees to inform **COMPANY** and LDC of any discrepancies discovered in invoice statement and attempt to correct said discrepancies as soon as possible.

***ARTICLE III***
***AGENT'S GUARANTEES***

3.1 **AGENT** agrees to deliver one hundred percent (100%) of **COMPANY'S** natural gas requirements for each month throughout the term of this Agreement. In the event **AGENT** is unable to deliver one hundred percent (100%) of said volume, **AGENT** agrees to reimburse **COMPANY** for the difference between **AGENT'S** price and the LDC's price for any gas purchased from the LDC during that particular month.

3.2 **AGENT** agrees that the price charged to **COMPANY** will never be greater than those charges associated with gas purchased from the LDC by Companies of the same size and category as **COMPANY** throughout the term of this Agreement. In the event gas subject to this Agreement has been delivered to **COMPANY** during a month that the LDC was willing to sell to a Company of similar size and category at a lessor [sic] price, **AGENT** agrees to adjust said price charged for that particular month to equal the said LDC cost for gas for that particular month.

3.3 If any penalties are placed on the **COMPANY** by the LDC, throughout the term of this Agreement, because of failure on behalf of **AGENT** to administrate and/or balance **COMPANY'S** account while **AGENT** is functioning within the rules and limitations imposed by the LDC, **AGENT** agrees to pay said penalties to the LDC and hold the **COMPANY** harmless for said charges.

3.4 **AGENT** agrees to submit payment for transportation costs incurred by **COMPANY** for natural gas delivered to **COMPANY'S** facility throughout the term of this Agreement in a timely manner. In the event any late charges are incurred, **AGENT** agrees to pay said charges to the LDC and hold **COMPANY** harmless for said charges. . . .

Amended Complaint, Exhibit F. Petri's Agency Agreement contains similar language. *See* Amended Complaint, Exhibit H.

17. Santanna also agreed in the Agency Agreements to (1) meet 100% of the plaintiffs' monthly natural gas requirements; (2) charge a price not greater than the price charged by the LDC; (3) pay any penalties imposed on the plaintiffs as a result of Santanna's mismanagement of the accounts; and (4) submit payments for the plaintiffs' transportation costs in a timely fashion. *See supra* at 57, n. 16 (reproducing §§ 3.1–3.4 of Todd's agreement). However, none of these "guarantees" implicates agency principles. Unlike the agency obligations listed in the text, these assurances are akin to the promises made in typical buyer-seller relationships: One party agrees to sell a commodity at a certain price and to oversee the transportation of the commodity. As a corollary, these sections of the agreements cannot be the source of a fiduciary duty.

is the fiduciary duty owed by the agent to his principal."). It follows that under the Agency Agreements, the defendants assumed certain fiduciary responsibilities, at least with respect to Santanna's role as an intermediary between the plaintiffs and the LDC.

■ Furthermore, even if we were mistaken in our conclusion that a fiduciary duty existed as a matter of law, it appears that an outright dismissal of Count IV would still be inappropriate. In Illinois, "[w]here a fiduciary relationship does not exist as a matter of law, it may nevertheless arise where trust and confidence, by reason of friendship, agency and experience, are reposed by one person in another so the latter gains influence and superiority over the former." *Pottinger v. Pottinger*, 238 Ill.App.3d 908, 179 Ill.Dec. 116, 605 N.E.2d 1130, 1137 (1992); *accord Simon v. Wilson*, 291 Ill.App.3d 495, 225 Ill.Dec. 800, 684 N.E.2d 791, 797 (1997); *see generally Eldridge v. Eldridge,* 246 Ill. App.3d 883, 186 Ill.Dec. 818, 617 N.E.2d 57, 62 (1993) (explaining that fiduciary duties may encompass "both technical fiduciary relations and those informal relations which exist whenever one person trusts in and relies upon another"). The law is similar in Texas. *See Thanksgiving Tower Partners v. Anros Thanksgiving Partners*, 64 F.3d 227, 231 (5th Cir.1995) ("Under Texas law, a fiduciary relationship can be created outside of a formal agreement 'in the context of informal moral, social, domestic, or personal relationships in which one person trusts and relies on another.'") (citation omitted); *accord Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.*, 823 S.W.2d 591, 594 (Tex.1992); *Berry v. First Nat'l Bank of Olney*, 894 S.W.2d 558, 560 (Tex.App.1995); *see generally Roberts v. Dayton Hudson Corp.*, 914 F.Supp. 1421, 1423 (N.D.Tex.1996) (stating that while fiduciary duties "are generally imposed upon certain formal legal relationships as a matter of law," relationships which create fiduciary duties may also be created informally). Admittedly, it would be difficult for the plaintiffs to show that they developed an informal fiduciary relationship with the defendants under Illinois law, *see Oil Express Nat'l Inc. v. Burgstone*, 958 F.Supp. 366, 370 (N.D.Ill.1997) (commenting that "mere allegations that one businessman simply trusted another to fulfill his contractual obligations is certainly not enough to establish a fiduciary relationship") (citation and internal marks omitted); *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 272 Ill.App.3d 370, 208 Ill.Dec. 455, 649 N.E.2d 511, 518 (1995) ("Generally, where parties capable of handling their business affairs deal with each other at arm's length, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged servient party, no fiduciary relationship will be deemed to exist."), and their task would be no less exacting under Texas law. *See Imperial Premium Fin., Inc. v. Khoury*, 129 F.3d 347, 353 (5th Cir.1997) (reiterating that "particularly in the business arena, trust and reliance alone are not sufficient ingredients" for a fiduciary relationship, "for '[t]he fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship'") (quoting *Crim Truck*, 823 S.W.2d at 594); *Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 301 (Tex.App.1996) ("Fiduciary duty is an extraordinary duty which will not be lightly created."). At a minimum, however, the plaintiffs would be entitled to an opportunity to present proof to support an "informal fiduciary relationship" theory if they so desired. This would be true even though the plaintiffs have thus far focused their attention on the alleged fiduciary relationship that arose as a matter of law as a result of the Agency Agreements. For as the Seventh Circuit noted in *Albiero*, "[h]aving specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint." 122 F.3d at 419; *see also Midwest Commerce*, 4 F.3d at 523 (reasoning that "Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case"); *Mid Am. Title Co. v. Kirk*, 991 F.2d 417, 421 (7th Cir.1993) (holding that "the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal") (citation omitted).

■ The defendants, second argument—that the limited scope of the Agency Agreements foils the plaintiffs' claim—raises

a separate but related question. The question, of course, is whether any of the actions allegedly taken by Santanna could constitute breaches of the fiduciary duty created by the agreements. *See Generally Martin v. Heinold Commodities, Inc.,* 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840, 845 (1987) (observing that "as a general rule, an agent's fiduciary duty is limited to actions occurring within the scope of his agency"); *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d 408, 416 (Tex.App.1986) (citing *Rankin v. Naftalis,* 557 S.W.2d 940, 944 (Tex. 1977) for the proposition that "[a] fiduciary duty owed by one person to another extends only to dealings within the scope of the fiduciary relationship between the parties"). As discussed in the background section of this opinion, the plaintiffs allege that Santanna breached a fiduciary duty by (1) using ambiguous contracts and charging prices higher than the lowest monthly market price; (2) charging prices higher than those charged by the LDC; (3) misrepresenting the amount customers can save on annual natural gas bills; (4) failing to disclose that it was charging prices higher than the lowest monthly market price; and (5) failing to disclose that it was charging prices higher than those charged by the LDC. Amended Complaint ¶ 79. The first two alleged acts are simply restatements of the plaintiffs' claim that the defendants overcharged the plaintiffs, thereby violating the terms of the agreements.

While these acts may render the defendants liable for breach of contract, they are not within the scope of Santanna's responsibilities to act as a good faith intermediary for the plaintiffs vis-a-vis the LDC. As a consequence, these acts cannot constitute breaches of a fiduciary duty. Similarly, the third alleged act involves representations that were made *before* the Agency Agreements were consummated, and thus cannot constitute a breach of the fiduciary duty imposed by those agreements. In contrast, the fourth and fifth alleged acts do fall within the scope of Santanna's agency. Those acts involve Santanna's failure to disclose potentially material facts. Moreover, the plaintiffs claim that Santanna had exclusive possession of the relevant information,[18] since the agreements permitted the defendants to receive and review the plaintiffs' LDC invoices. It is therefore conceivable that these acts represent abrogations of Santanna's fiduciary responsibilities. *See generally Federal Pants, Inc. v. Stocking,* 762 F.2d 561, 565 (7th Cir. 1985) ("[A]n agent has the duty to use reasonable efforts to give his principal information relevant to affairs entrusted to the agent."); *Randal Craft Realty Co. v. Unijax, Inc.,* 653 F.2d 1066, 1069 (5th Cir.1981) (holding that upon discovering facts relevant to the affairs entrusted to him, a broker, as a fiduciary, has a duty to communicate those facts to his principal); *Connick,* 675 N.E.2d

18. The defendants argue that "Plaintiffs' breach of fiduciary duty argument is ... premised on the assertion that Santanna did not send copies of the LDC invoices to Plaintiffs" and that "Santanna, as part of its monthly invoices to Plaintiffs, attached copies of the LDC invoices relating to Plaintiffs' accounts." Santanna Reply at 13. The defendants then refer the court to several sample invoices attached to the individual defendants' memorandum. The defendants conclude that "Plaintiffs were thus fully informed each month of the prices charged by Santanna and the LDC." *Id.* Three problems undercut the defendants' argument. First, Santanna raised this point for the first time in its reply brief, thereby waiving it. *See supra* at 977 (citing authorities for the proposition that such arguments are waived). Second, when considering a motion to dismiss pursuant to Rule 12(b)(6), "the court may not look beyond the pleadings in ruling on the motion." *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). Indeed, were we to consider the sample invoices, we would be required to convert the current motion into one for summary judgment. Fed.R.Civ.P. 12(b); *Tacket v. General Motors Corp., Delco Remy Div.,* 93 F.3d 332, 334 (7th Cir.1996); *Fleischfresser v. Directors of Sch. Dist. 200,* 15 F.3d 680, 684 & n. 2 (7th Cir.1994). That is not a particularly appealing option, since it would only increase the amount of time needed to resolve the motion (as well as the length of this already sizeable opinion). Third, it is not obvious that the documents attached to the individual defendants' memorandum fall within the exception created by *Venture Associates Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429 (7th Cir. 1993), i.e. that the documents should be considered part of the pleadings because they are "referred to in the plaintiff's complaint and are central to her claim." *Id.* at 431. The documents attached to the defendants' motion may eventually prove to be highly useful in determining the merit of the plaintiffs' allegations. But at this stage it is uncertain whether the two *sample* invoices (which were presumably handpicked by the defendants) are in fact central to the plaintiffs' claim.

at 593 ("[I]f plaintiff and defendant are in a fiduciary or confidential relationship, then defendant is under a duty to disclose all material facts."); *First City Mortgage Co. v. Gillis,* 694 S.W.2d 144, 146 (Tex.App.1985) (reiterating that a broker's fiduciary responsibility "imposes the duty of communicating all information he may possess which is material to his principal"). Accordingly, Count IV is dismissed only insofar as it is premised on the first three acts listed in paragraph 79 of the complaint.

## III. Counts V and VI: The Racketeer Influenced and Corrupt Organizations Act

Congress enacted the Racketeer Influenced and Corrupt Organizations Act "in an attempt to eradicate organized, long-term criminal activity." *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1019 (7th Cir.1992); *accord 420 East Ohio Ltd. Partnership v. Cocose,* 980 F.2d 1122, 1123 (7th Cir.1992). Congress created a two-pronged enforcement regime, a regime that includes both criminal prosecutions by the government and civil suits by private citizens. To encourage the latter, Congress provided plaintiffs with the opportunity to recover treble damages, costs, and attorney's fees if they can establish a RICO violation by a preponderance of the evidence. *Midwest Grinding,* 976 F.2d at 1019 (citations omitted). Section 1962(c) of Title 18 states that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The Supreme Court has interpreted this portion of the statute to mean that "[t]he elements predominant in a subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activi-

ty." *Salinas v. United States,* —— U.S. ——, 118 S.Ct. 469, 476, 139 L.Ed.2d 352 (1997) (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)); *accord Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 473 (7th Cir. 1997); *Hoban v. USLIFE Credit Life Ins. Co.,* 163 F.R.D. 509, 515 (N.D.Ill.1995).

Although the allegations in Counts V and VI differ in one important respect, they are similar in others. Both counts claim that the defendants engaged in a scheme to defraud in violation of 18 U.S.C. §§ 1341 and 1343 by committing the same five acts discussed in Counts II, III, and IV, *see* Amended Complaint ¶¶ 85, 97, and both counts allege that the defendants used the mails, interstate carriers, and interstate wire transmissions in furtherance of the scheme to defraud by (1) receiving by mail monthly LDC bills for distribution services; (2) sending monthly bills to the plaintiffs seeking to collect certain charges; (3) receiving the plaintiffs' payments through the mail; (4) forwarding the Agency Agreements and Gas Sales Contracts from Santanna's headquarters in Texas to Santanna's local sales representatives in Illinois for execution by the plaintiffs; and (5) transmitting the executed agreements and contracts from Santanna's local sales representatives in Illinois to Santanna's headquarters in Texas. *Id.* ¶¶ 86, 98. The most significant difference between Counts V and VI is the way in which each count alleges the relevant "person" and "enterprise." Count V states that each of the individual defendants is a "person" as defined by 18 U.S.C. § 1961,[19] and that Santanna is an "enterprise" as defined by § 1961.[20] *Id.* §§ 83–84. Count VI, on the other hand, states that Santanna is the "person" and that each of the plaintiffs is the "enterprise." *Id.* ¶¶ 94–95.

The defendants maintain that the dismissal of both counts is in order for three reasons. First, they argue that the complaint fails to identify "the time, place, or content of even a *single* communication [the plaintiffs] believe

---

**19.** The statute defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

**20.** The statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

perpetrated a mail or wire fraud." Santanna Memorandum at 15. Second, the defendants argue that the purported five uses of the mails cannot be classified as "racketeering activity," because none of the alleged mailings were in furtherance of an illegal scheme. They contend that (1) Santanna's receipt of monthly LDC invoices did not involve any wrongdoing by the individual defendants and could not have been part of the allegedly fraudulent scheme, Individual Defendants Memorandum at 6; (2) Santanna's act of mailing invoices to the plaintiffs made it more (rather than less) likely that the plaintiffs could have discovered the alleged scheme, *id.* at 6–7; (3) by definition, the plaintiffs' use of the mails to pay monthly bills could not have been part of the defendants' alleged scheme, *id.* at 7–8; and (4) as a matter of law, Santanna's acts of the mailing of blank and executed contracts between offices do not constitute "racketeering activity." *Id.* at 8. Third, the individual defendants argue that the complaint fails to allege a "pattern" of racketeering activity. They aver that the plaintiffs have not alleged predicate acts which are related and create a risk of "continuing" racketeering activity, using either an "open-ended" or a "closed-ended" definition of continuity. *Id.* at 8–12; Individual Defendants Reply at 6–7.

We begin with the defendants' first argument: that the complaint fails to provide essential details about the defendants' alleged uses of the mails. At the outset, it is important to note what the plaintiffs have *not* alleged. Neither count alleges that the defendants used the mails to disseminate their supposedly fraudulent brochures. The hypothesis that the defendants used the mails to distribute their promotional literature to prospective customers is certainly consistent with the plaintiffs' existing allegations. But we are unwilling to give the plaintiffs the benefit of that assumption for two reasons. First, if the defendants did indeed use the mails to deliver "thousands" of misleading brochures, the obvious relevance of that fact makes it almost unfathomable that the plaintiffs would have accidentally omitted it from their RICO allegations. *Cf.* Individual Defendants Reply at 6 ("Certainly, if Santanna had sent the brochures to the Plaintiffs by mail, Plaintiffs would have alleged it."). Second, and perhaps more importantly, the court is empowered to "hypothesize" consistent facts only when considering a motion to dismiss pursuant to Rule 12(b)(6). Claims subject to Rule 9(b) are not entitled to the same leniency. For that reason, we will confine our analysis to the five uses of the mails specifically alleged in the complaint.

Our evaluation of the five alleged uses of the mails is, of course, governed by Rule 9(b). It is beyond cavil that the rule "applies to allegations of mail and wire fraud and by extension to RICO claims that rest on predicate acts of mail and wire fraud." *Jepson,* 34 F.3d at 1327 (citing, among other cases, *Schiffels v. Kemper Fin. Services, Inc.,* 978 F.2d 344, 352 (7th Cir.1992)). Thus,

> "loose references to mailings and telephone calls" in furtherance of a purported scheme to defraud will not do. Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications. These details are mandated not only by Rule 9(b), but by the very nature of a RICO claim. For "[w]ithout an adequately detailed description of the predicate acts of mail and wire fraud, a complaint does not provide either the defendant or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established."

*Id.* at 1328 (quoting *R.E. Davis Chem., Corp. v. Nalco Chem. Co.,* 757 F.Supp. 1499, 1516 (N.D.Ill.1990)); *accord Blum v. Spatz,* No. 94 C 883, 1995 WL 12285, at *6 (N.D.Ill. Jan.11, 1995) (Grady, J.); *Fujisawa,* 814 F.Supp. at 731.

Here, a careful review of the complaint reveals that the plaintiffs have failed to allege the predicate acts of mail fraud with the requisite specificity. The plaintiffs are plainly aware of both the timing and the specific content of most of the mailings alleged in Counts V and VI, but they have neglected to include these details in the complaint. While it would be unreasonable to expect the plaintiffs to allege which individual defendants were responsible for drafting

and mailing many of the items listed in the complaint, *see Alumax Mill Products, Inc. v. Krzysztofiak,* No. 96 C 5012, 1997 WL 201555, at *3 (N.D.Ill. Apr.17, 1997) (recognizing that during the early stages of a lawsuit a plaintiff "may not be privy ... to information that establishes which particular defendant created and mailed" particular invoices); *see also supra* at 974–975 (discussing why the plaintiffs at this time are not required to identify the individuals who drafted and disseminated the brochures), it is altogether reasonable to expect them to allege the dates and substance of the mailings which were within their possession or control. For example, the plaintiffs allege that Santanna "sent them monthly bills by mail," and that those bills "sought payment of amounts that were in excess of those which should have been charged." Amended Complaint ¶¶ 86, 98. The plaintiffs also allege that they, along with "most if not all" of the other consumers Santanna supposedly defrauded, "paid the inflated bills sent them by Santanna by mail." *Id.* The plaintiffs further allege that Santanna "received by mail on a monthly basis bills for distribution services from the LDC." *Id.* Even though these bills were first mailed to Santanna, the plaintiffs surely are aware of the specifics of at least some of these invoices, since their primary claim is that Santanna charged rates greater than those of the LDCs. Vague references to unspecified billing statements and payment checks fall short of what is required by Rule 9(b). *See Midwest Grinding,* 976 F.2d at 1020 (dismissing a RICO claim under Rule 9(b) because the plaintiff neglected to identify the dates on which the defendants mailed false invoices and because the plaintiff had "peculiar access" to the invoices); *Cumis Ins. Soc'y, Inc. v. Peters,* 983 F.Supp. 787, 795 (N.D.Ill.1997) (dismissing a RICO claim under Rule 9(b) because the plaintiff failed to specifically identify fraudulent accounting statements and checks); *cf. Alumax,* 1997 WL 201555 at *3 (refusing to dismiss a RICO claim under Rule 9(b) because the complaint detailed "the date and number of the invoices, [and] the exact amount charged and overbilled"); *Bruss Co. v. K & S Brokerage, Inc.,* No. 91 C 1561, 1991 WL 251645, at *3 (N.D.Ill. Nov.22, 1991) (refusing to dismiss a RICO claim under Rule 9(b) because the plaintiff's allegations of mail fraud "include[d] references to specific dates of either the negotiation, acceptance, or transmission of fraudulent sales orders" and "described with some specificity the nature of the information conveyed and the particular components that gave the invoices their purported fraudulent character"). So while the plaintiffs have arguably outlined the contours of the defendants' allegedly fraudulent scheme, *see supra* at 975, they have insufficiently described the predicate offenses that undergird the scheme. *Cf. R.E. Davis,* 757 F.Supp. at 1516–17 (holding that "although the complaint may adequately describe an overall scheme, ... on balance the complaint does not adequately describe the manner in which each of the defendants participated in the broadly—referenced predicate acts of racketeering, when and how such offenses took place, and how they furthered the overall scheme to defraud plaintiff"). For that reason, Counts V and VI are dismissed.

■ Because we conclude that Counts V and VI fail to describe the allegedly fraudulent uses of the mails with the particularity required by Rule 9(b), we reserve judgment on the issues raised by the defendants' second and third arguments. However, an additional observation is in order. As discussed above, one of the lessons of *Jepson* is that without a detailed description of the predicate acts of mail fraud, it is often impossible to determine whether or not a defendant has engaged in a "pattern" of illegal activity. 34 F.3d at 1328. That lesson is especially apropos to the case at hand. The plaintiffs allege not only that Petri and Todd were individually harmed by the defendants' conduct, but also that an entire class of consumers was injured by the defendants' purportedly fraudulent scheme. In support of their position that the complaint adequately alleges a "pattern" of racketeering activity, the plaintiffs focus their attention on the defendants' mailings to *all* of the members of the proposed class, not just on the defendants' uses of the mails in connection with Petri and Todd's individual contracts. *See* Plaintiffs' Response To The Motion To Dismiss Of Defendants T. Wayne Gatlin, Jess[e] D. Smith And

Jerry Pajares at 10–11 (asserting that the complaint should be read to allege that "the defendants conducted a pattern of mail fraud for a period of at least four years which has affected thousands of persons"); *accord id.* at 12. Conversely, the defendants focus their attention on their purported uses of the mails in connection with the named plaintiffs. They contend that the period over which Petri and Todd were allegedly overcharged was less than ten months, and that "[a] ten month period is clearly insufficient to constitute a 'pattern' under well-settled Seventh Circuit law." Individual Defendants Reply at 6 (citing *Midwest Grinding*, 976 F.2d at 1024); *accord* Individual Defendants Memorandum at 10–11. The plaintiffs may very well be able to show that the defendants engaged in a "pattern" of racketeering activity, but they cannot do so by relying on undifferentiated allegations that scores of consumers were defrauded as a result of the defendants' use of the mails. On this point, *Emery v. American Gen. Fin., Inc.*, 71 F.3d 1343 (7th Cir.1995) is instructive. In that case, the plaintiff attempted to establish a pattern of illegal activity by generally alleging that the defendant committed the same fraudulent acts against other customers. The plaintiff provided "no names or dates or other details of transactions involving any other customer" besides herself. *Id.* at 1348. The court rejected this approach, stating that although "[t]hese details would not be necessary to identify additional members of the plaintiff's class," they *were* necessary to satisfy RICO's pattern requirement under Rule 9(b). *Id.; see also Ewing v. Midland Fin. Co.*, No. 96 C 222, 1997 WL 627644, at *12 (N.D.Ill. Sept.26, 1997) (holding that while allegations that a defendant defrauded a class of similarly situated consumers "may imply further predicate acts, they do not satisfy the pleading requirements for fraud under RICO and Rule 9(b)"). If Petri and Todd attempt to amend their RICO claims to comport with today's decision, it would behoove them to carefully consider cases such as *Emery*.

Moreover, the defendants have identified an independently fatal defect in Count VI. They argue that Count VI fails to state a cognizable RICO claim because Santanna neither conducted nor participated in the conduct of the plaintiffs' affairs. Santanna Memorandum at 16–17; *see also* Individual Defendants Memorandum at 12–13 (adopting the arguments in Santanna's memorandum by reference). Citing the Supreme Court's decision in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the defendants contend that a person cannot be liable under § 1962(c) unless he participates in the "operation and management" of the alleged enterprise, and that Santanna did not participate in the operation and management of the plaintiffs' apartment buildings. Santanna Memorandum at 17; Santanna Reply at 14.

The starting point for the analysis is the high court's decision in *Reves* and its application in this Circuit. The issue in *Reves* was whether an outside accounting firm could be liable under § 1962(c) for incorrectly valuing a farm cooperative's assets on the cooperative's financial statements. The Court held that it could not, reasoning that the firm had not conducted or participated in the conduct of the cooperative's affairs. 507 U.S. at 185–86. The Court adopted an "operation or management" test, stating that

> [o]nce we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id.* at 179 (emphasis in original and footnote omitted); *see also id.* at 183 (holding that liability does not attach under § 1962(c) "unless one has participated in the operation or management of the enterprise itself"). In *MCM Partners, Inc. v. Andrews–Bartlett & Associates, Inc.*, 62 F.3d 967 (7th Cir.1995),

the Seventh Circuit recognized that the Supreme Court distinguished "outsider" defendants, such as the accounting firm in *Reves,* from "lower-rung participants" under the direction of upper management. The Seventh Circuit thus held that the "operation and management" test is relevant to the former but not the latter. 62 F.3d at 977, 978 (endorsing the logic of *United States v. Oreto,* 37 F.3d 739 (1st Cir.1994)); *accord Terrell v. Childers,* 920 F.Supp. 854, 863 (N.D.Ill. 1996); *In re Lake States Commodities, Inc.,* 936 F.Supp. 1461, 1476 (N.D.Ill.1996); *see also National Org. for Women, Inc. v. Scheidler,* No. 86 C 7888, 1997 WL 610782, at *10 (N.D.Ill. Sept.23, 1997) (stating that a RICO enterprise may be operated by (1) upper management, (2) lower-rung participants who are under the direction of upper management, or (3) "others associated with the enterprise who exert control over it") (citation omitted).

▆ In the case at bar, the plaintiffs can neither allege nor prove that Santanna "operated or managed" the plaintiffs' enterprises. The defendants hold no positions of authority within the plaintiffs' enterprises and are not the plaintiffs' employees, and therefore clearly qualify as "outsiders" in relation to the plaintiffs' apartment complexes. Petri and Todd aver that as a result of the Agency Agreements, Santanna, acting in its capacity as an agent, managed the plaintiffs' purchases of natural gas. Response to Santanna at 16; *see also* Amended Complaint ¶ 96 ("Defendants undertook, as agents, to manage the purchasing of natural gas on behalf of each plaintiff and class member."). As we previously noted in the context of the plaintiffs' claim for breach of fiduciary duty, it is true that the defendants "managed" — as that term is commonly understood—certain aspects of the plaintiffs' relationship with the LDC. But that type of management is entirely different from the "operation or management" contemplated by *Reves* and its progeny. One could easily say, without doing violence to the dictionary definition of "manage," that an accountant "manages" several aspects of an enterprise's financial affairs. As the Supreme Court made clear in *Reves,* however, the "management" of an enterprise's accounting matters is not synony-

mous with the "operation or management" of that enterprise under RICO. 507 U.S. at 172–75, 184–86; *accord University of Md. at Baltimore v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539–40 (3d Cir.1993); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 254–55 (S.D.N.Y.1997); *Terrell,* 920 F.Supp. at 863–64; *Tonnemacher v. Sasak,* 859 F.Supp. 1273, 1276–77 (D.Ariz. 1994). One could also reasonably argue that an attorney "manages" an enterprise's legal affairs, but courts have uniformly rejected the notion that the provision of legal services qualifies as the "operation and management" of an enterprise for purposes of RICO liability. *See, e.g., Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521–22 (2d Cir.1994); *Baumer v. Pachl,* 8 F.3d 1341, 1344–45 (9th Cir.1993); *Nolte v. Pearson,* 994 F.2d 1311, 1317 (8th Cir.1993); *Morin v. Trupin,* 832 F.Supp. 93, 98 (S.D.N.Y.1993); *Sassoon v. Altgelt, 777, Inc.,* 822 F.Supp. 1303, 1307 (N.D.Ill.1993).

It stands to reason that the Agency Agreements in this case did not require the defendants to "operate or manage" the plaintiffs' apartment complexes in the legally relevant sense. As the defendants note in their brief, neither the agreements nor the complaint indicates that Santanna had a hand in leasing units within the complexes, collecting rent, responding to tenant complaints, or making primary decisions about the purchase of equipment and services. Santanna Reply at 14. Indeed, the very existence of the Agency Agreements tends to demonstrate that the *individual plaintiffs,* rather than the defendants, operated and managed the apartment buildings. A person who delegates certain tasks in connection with an enterprise thereby exercises control over the enterprise. The person to whom authority is delegated may enjoy a considerable amount of discretion in carrying out those tasks, but the ultimate decisionmaking power resides with the delegator. A recent decision from this district illustrates the point. In *Williams v. Ford Motor Co.,* 980 F.Supp. 938 (N.D.Ill. 1997), the plaintiff alleged a RICO violation by the Ford Motor Company (the "enterprise") and one of its dealerships, Highland Park Ford (the "person"). The plaintiff argued that Highland's agency relationship

with Ford "conferred the degree of control over Ford's affairs necessary to give rise to RICO liability." *Id.* at 942. In particular, the plaintiff argued that Highland had entered into an agreement with Ford under which Highland (1) sold extended service plans ("ESPs") for Ford, (2) informed consumers of inspection fees, (3) demanded payment of and collected inspection fees on Ford's behalf, and (4) performed repairs covered by the service plans. The court concluded that, at most, the plaintiff's allegations "show[ed] that Highland carried out its ESP obligations pursuant to written agreements with Ford, indicating a relationship of control flowing from Ford to Highland, rather than the other way around." *Id.* We likewise conclude in this case that the defendants did not "operate or manage" the plaintiffs' enterprises in a manner sufficient to support RICO liability, the fiduciary responsibilities created by the Agency Agreements notwithstanding. *Cf. Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, 832 F.Supp. 585, 591 (E.D.N.Y.1993) (remarking that a defendant who may be liable for a breach of fiduciary duty is not necessarily liable for treble damages and attorney's fees under RICO). Count VI is dismissed for this reason as well.[21]

### CONCLUSION

For the foregoing reasons, Santanna's and the individual defendants' motions to dismiss the complaint are granted in part and denied in part. Count I is dismissed only insofar as it is premised on a violation of § 3.1 of Petri's Gas Sales Contract. Counts II and III are dismissed only insofar as they are premised on the first, fourth, and fifth grounds listed in paragraphs 67 and 73 of the complaint. Count IV is dismissed only insofar as it is premised on the first three grounds listed in paragraph 79 of the complaint. Counts V and VI are dismissed in their entirety. If the plaintiffs believe they can reformulate these counts to comport with this opinion, they may present a proposed amendment and move for leave to file it by January 20, 1998. Otherwise, the dismissal of Counts V and VI will be with prejudice. A hearing will be held at 9:45 a.m. on February 3, 1998, at which the parties should be prepared to discuss the status of the case and the court will set a time for defendants to answer the complaint as then constituted.

**21.** Our conclusion that Count VI fails to state a claim is entirely consistent with our earlier discussion of the liberal system of notice pleading envisioned by the Federal Rules. As one might surmise from the cases cited in the text, *Reves'* "operation and management" test is routinely applied by courts when evaluating motions to dismiss. *See, e.g., Williams,* 980 F.Supp. 938, 938–40; *Lake States,* 936 F.Supp. at 1466, 1475–77; *Arenson,* 880 F.Supp. at 1206, 1208–09; *A.I. Credit,* 847 F.Supp. at 596, 601–02; *Sassoon,* 822 F.Supp. at 1307; *see generally Peat. Marwick,* 996

F.2d at 1539 (rejecting the argument that the "operation and management" test applies only in the summary judgment context). More importantly, there is no basis for hypothesizing facts consistent with the complaint that would enable the plaintiffs to salvage their claim. The nature of Santanna's purported "management" of the plaintiffs' apartment complexes is abundantly clear from the text of the complaint and the parties' memoranda, making it nearly impossible to imagine additional facts that might entitle the plaintiffs to relief.